

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-196-CV

STEPHEN C. WALTERS, D.D.S.;                                    APPELLANTS
ARLINGTON ORAL SURGERY, P.A.;
AND PARTY DOING BUSINESS AS
ARLINGTON ORAL SURGERY

V.

TRINA HUDOBA, INDIVIDUALLY                                     APPELLEE
AND ON BEHALF OF THE ESTATE
OF ELIZABETH TAYLOR, DECEASED

------------

## FROM THE 153RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Stephen C. Walters, D.D.S., and Arlington Oral Surgery, Appellants, (collectively referred to herein as Dr. Walters) appeal the trial court's denial of their motion to dismiss Appellee Trina Hudoba's dental malpractice claim for the

------

[1] *See* Tex. R. App. P. 47.4.

alleged failure to file an adequate expert report. Because Appellee timely filed an adequate expert report, the trial court did not abuse its discretion by refusing to dismiss the suit. Accordingly, we will affirm the trial court's order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellee's daughter, Elizabeth Taylor, sought treatment from Dr. Walters for a tooth extraction. Taylor was five-foot-three-inches tall and weighed 290 pounds; she suffered from a heart murmur, high blood pressure, chest pain, irregular heart beat, bronchitis, asthma, and sleep apnea. Prior to performing the tooth extraction procedure, Dr. Walters administered general anesthesia to Taylor. Following the administration of the anesthesia drugs, Taylor stopped breathing. Resuscitation efforts commenced; Dr. Walters intubated Taylor—placing the tube into Taylor's stomach instead of her lungs—and a call to 911 was placed. Paramedics arrived and transported Taylor to the hospital where she was pronounced dead on arrival.

The State Board of Dental Examiners (the Board) initiated an investigation into Taylor's death. Roger P. Byrne, D.D.S, M.D. examined the Board's investigative file and prepared an expert report for the Board. The report is eighteen pages long and details the records Dr. Byrne reviewed, the statements Dr. Byrne reviewed, the sequence of events that occurred, the "record keeping" standard of care violations by Dr. Walters, and the nine "standard of care

2

violations committed by Dr. Walters which led to Ms. Taylor's death." It contains a report summary concluding that "[i]t is my opinion Dr. Walters'[s] negligent acts are responsible for the demise of Ms. Elizabeth Taylor." A copy of Dr. Byrne's report is attached to this opinion as Appendix A.

Appellee attached Dr. Byrne's report to her October 30, 2007 original petition to satisfy the statutory expert report requirement. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (Vernon Supp. 2008). Appellants timely filed an answer that, in two paragraphs, objected to Dr. Byrne's expert report. Specifically, Appellants alleged that

> 8. Defendants object to the correspondence/report and curriculum vitae of Roger P. Byrne, D.D.S., M.D., as attached to Plaintiff's Original Petition. Dr. Byrne's correspondence, with attached curriculum vitae, is confidential communication to the State Board of Dental Examiners, and therefore, should not be attached to Plaintiff's Original Petition. Defendants further object to any attempt by Plaintiff [sic] utilize Dr. Byrne's correspondence to comply with the expert report requirements of Chapter 74 of the Texas Civil Practice & Remedies Code.

> 9. To the extent that Plaintiff is attempting to utilize the correspondence and curriculum vitae of Roger P. Byrne, D.D.S., M.D. to comply with the expert report requirements of Chapter 74 of the Texas Civil Practice & Remedies Code, Defendants object to the opinions and qualifications of Dr. Byrne in accordance with Chapter 74 of the Texas Civil Practice & Remedies Code. Additionally, Defendants object to the sufficiency of the report/correspondence and curriculum vitae of Dr. Byrne in accordance with Chapter 74 of the Texas Civil Practice & Remedies Code.

3

The record reflects that Appellee requested a hearing on Dr. Walters's objections, set forth above. Dr. Walters filed "Objections to Hearing on Chapter 74 Objections," claiming that "Chapter 74 does not permit the Court to rule on Defendants' objections to Plaintiff's expert report prior to the 120-day deadline" and requesting that "the hearing on Defendants' objections to Plaintiff's expert report be reset until after the 120-day deadline." The trial court conducted a hearing on January 14, 2008, within 120 days of Appellee's October 30, 2007 filing of her original petition. The trial court signed a February 5, 2008 order overruling Dr. Walters's objection to conducting the hearing prior to the 120-day deadline and also overruling Dr. Walters's objections to the expert report of Dr. Byrne.

On March 14, 2008, Dr. Walters filed a motion to dismiss Appellee's claim for "failure to comply with Chapter 74 expert report requirement." Dr. Walters specifically alleged that Dr. Byrne was not qualified and that his report "fails to establish the causal relationship between defendants' alleged negligence and Elizabeth Taylor's death." Appellee filed objections and a response to Dr. Walters's motion to dismiss. Appellee contended that "a hearing was already held on all of Defendants' objections to Plaintiff's expert report under Chapter 74 and all of Defendants' objections were overruled."

4

The trial court conducted a hearing on Dr. Walters's motion to dismiss on April 8, 2008. The trial court signed an April 21, 2008 order overruling Appellee's objection to the motion to dismiss contending that all objections to Dr. Byrne's report had been overruled by the trial court's prior order. The trial court also denied Dr. Walters's motion to dismiss. Dr. Walters perfected this appeal.

### III. DR. WALTERS'S APPELLATE CONTENTIONS

In his sole issue, Dr. Walters contends that the trial court abused its discretion by denying his motion to dismiss. Dr. Walters argues on appeal that Dr. Byrne's report "fails to establish the causal relationship between Dr. Walters'[s] alleged negligence and Ms. Taylor's death." Specifically, Dr. Walters claims that Dr. Byrne's report (1) addresses Dr. Walters's alleged violation of the State Board's rules, but it "does not establish the causal relationship between Dr. Walters'[s] purported negligence and Elizabeth Taylor's death;" (2)"is conclusory because he fails to rule out other possible causes of Ms. Taylor's death;" (3) "fails to explain how Dr. Walters'[s] failure to appropriately treat Ms. Taylor's respiratory depression caused her death;" (4) "omits any explanation for how Dr. Walters'[s] administration of general anesthesia proximately caused Ms. Taylor's death;" (5) "contains a large analytical gap[] in that he failed to explain how Dr. Walters'[s] administration

5

of Versed, Fentanyl, and Propofal proximately caused Ms. Taylor's death;" and (6) "fails to flesh out how Dr. Walters'[s] administration of general anesthesia and failure to respond to Ms. Taylor's respiratory depression caused Ms. Taylor's death."

On appeal, Dr. Walters does not raise any challenge to Dr. Byrne's qualifications, but on page 8 of his brief he complains:

> Dr. Byrne was retained by the Texas State Board of Dental Examiners ("State Board") to serve as an expert witness in the State Board's case involving Dr. Walters'[s] treatment of Ms. Taylor. Dr. Byrne wrote his report as an expert witness for the State Board. . . . Dr. Byrne's opinions are relevant to the State Board's investigation of Dr. Walters'[s] treatment of Ms. Taylor, . . . but Dr. Byrne's opinions are irrelevant in this malpractice case. . . . While Dr. Byrne's report addresses Dr. Walters'[s] alleged violation of the State Board's Rules, it does not establish the causal relationship between Dr. Walters'[s] purported negligence and Elizabeth Taylor's death."

Thus, Dr. Walters's two main appellate complaints concerning Dr. Byrne's report concern causation and Appellee's reliance on a report prepared for the Board.

## IV. WAIVER OF CAUSATION OBJECTION

Appellee claims that Dr. Walters waived all of his causation objections because he did not timely assert them in the trial court. Texas Civil Practice and Remedies Code, section 74.351(a) provides:

In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted. . . . *Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived*.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (emphasis added); *see also Maris v. Hendricks*, 262 S.W.3d 379, 385 (Tex. App.—Fort Worth 2008, pet. denied) (holding objection to sufficiency of chapter 74 expert report was waived because it was not asserted within the statutory twenty-one-day time period).

Dr. Walters concedes that he was required to object to Dr. Byrne's report within the statutory twenty-one-day time period; Dr. Walters explained at oral argument that the objection asserted in his answer that "Defendants object to the sufficiency of the report/correspondence and curriculum vitae of Dr. Byrne in accordance with Chapter 74 of the Texas Civil Practice & Remedies Code" impliedly included an objection to every statutory element of an expert report. Thus, Dr. Walters claims that he did timely assert his causation objection.

We cannot agree. Dr. Walters's only timely filed objections to Dr. Byrne's report were contained in paragraphs 8 and 9 of his original answer, set forth previously in this opinion. Dr. Walters objected to Appellee's use of a report

prepared for the Board and to the "opinions and qualifications of Dr. Byrne" and "the sufficiency of the report." Neither of these objections raise the objections to the causation element of Dr. Byrne's report set forth in his motion to dismiss or in his brief on appeal. *See* Tex. R. App. P. 33.1(a) (requiring objection to be specific); *Plemons v. Harris*, No. 02-08-00326-CV, 2009 WL 51290, *3 (Tex. App.—Fort Worth Jan. 8, 2009, no pet. h.) (holding objection to expert report made in trial court must comport with complaint asserted on appeal). Because Dr. Walters did not timely assert specific causation objections, he waived those objections. *See Ogletree v. Matthews*, 262 S.W.3d 316, 322 (Tex. 2007) (stating that any objection to report must be made within twenty-one days after service of report); *Williams v. Mora*, 264 S.W.3d 888, 891(Tex. App.—Waco 2008, no pet.) (holding that when defendant's only timely filed objections to expert report were that two statements were speculative, defendant waived all other objections); *Springer v. Johnson*, No. 07-07-00424-CV, 2008 WL 2346385, at *9 (Tex. App.—Amarillo June 4, 2008, no pet.) (holding objection to report not raised in trial court was waived). Because the causation objections asserted in Dr. Walters's motion to dismiss and in this appeal were not filed within twenty-one days of the service of Dr. Byrne's report, we hold they were waived and overrule the portion of Dr. Walters's issue arguing that

8

Dr. Byrne's report is inadequate on the issue of causation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a).

## V. DR. WALTERS'S OBJECTION CONCERNING USE OF REPORT PREPARED FOR THE BOARD

In the second portion of his sole issue, Dr. Walters argues that he did, however, timely object to Appellee's use of Dr. Byrne's report because the report was prepared for the Texas State Board of Dental Examiners. As set forth above, at page eight of his brief Dr. Walters attempts to bootstrap, or tie, his causation arguments to his preserved contention that the trial court abused its discretion by concluding that a report prepared for the State Board was an adequate report. We have held that Dr. Walters waived his causation objections; but in the interest of justice, alternatively, and because this causation argument is bootstrapped to an objection that Dr. Walters did timely make, we address Dr. Walters's causation arguments below.

### A. Standard of Review

We review a trial court's denial of a motion to dismiss for an abuse of discretion. *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 290–91 (Tex. App.—Fort Worth 2008, no pet.); *Maris*, 262 S.W.3d at 383. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or

9

principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986). Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. But a trial court has no discretion in determining what the law is or in applying the law to the facts, and thus "a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Ehrlich v. Miles*, 144 S.W.3d 620, 624 (Tex. App.—Fort Worth 2004, pet. denied).

## B. No Abuse of Discretion

A trial court must grant the motion to dismiss if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*). While the expert report "need not marshal all the plaintiff's proof," *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (construing former art. 4590i, § 13.01), it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care

provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

To constitute a good-faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Id.* at 879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* The claimant's expert must incorporate enough information to fulfill two purposes: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude the claims are meritorious. *Id.*

When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Id.* at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See id*. However, section 74.351 does not prohibit *experts*, as

11

opposed to courts, from making inferences based on medical history. *Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.); *see also* Tex. R. Evid. 703 (providing that an expert may draw inferences from the facts or data in a particular case); Tex. R. Evid. 705 (providing that expert may testify in terms of opinions and inferences).

To establish causation, an expert report must provide information linking the defendant's purported breach of the standard of care to the plaintiff's injury. *See Hutchinson v. Montemayor*, 144 S.W.3d 614, 617 (Tex. App.—San Antonio 2004, no pet.); *see also Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002). An expert must also explain the basis of his statements to link his conclusions to the facts. *Wright*, 79 S.W.3d at 52.

A review of Dr. Byrne's report refutes each of Dr. Walters's claims concerning its causation sufficiency. Dr. Byrne's report explains,

> It is my medical opinion, based on the known sequence of events and reasonable medical probability, Ms. Taylor's death on 11/4/05 resulted from three separate, but obviously connected, findings: 1) morbid obesity, reactive airway disease, "difficult airway", possibly contributing obstructive sleep apnea, hypertension and cardiac hypertrophy; 2) Dr. Walters['s] decision to perform an office-based operator-anesthetist general anesthesia on Ms. Taylor; and 3) respiratory depression, resultant apnea and hypoxia from the administration of Versed, Fentanyl, and Propofol medications with a progressive spiral of decline into a life-threatening emergency which was not appropriately treated by Dr. Walters.

12

After setting forth Dr. Walters's standard of care violations in classifying the pre-operative physical risk status of Ms. Taylor, Dr. Byrne opined, "It is my opinion Ms. Taylor should have had the tooth removed under a local anesthesia or possibly a conscious sedation and local anesthesia because of her significant general anesthesia medical risks." After setting forth Dr. Walters's standard of care violations in failing to consider the increased risk of office-based general anesthesia in a morbidly obese patient, Dr. Byrne opined, "In my medical opinion, Dr. Walters had an inadequate fund of knowledge, demonstrated poor clinical judgment, and possessed extremely low skill levels in his ability to manage and maintain a difficult airway which caused the death of Ms. Taylor." After setting forth Dr. Walters's standard of care violations in failing to train and rehearse his office staff in emergency procedures, Dr. Byrne opined, "In my opinion, the apparent lack of emergency training and performance by Dr. Walters and his staff caused Ms. Taylor's death." After setting forth Dr. Walters's standard of care violations in failing to appropriately treat Ms. Taylor's respiratory emergency by failing to immediately administer reversal agents, failing to establish an intubated airway, and failing to provide adequate respiratory support, Dr. Byrne opined, "It is my opinion, Dr. Walters had an inadequate fund of anesthesia knowledge about respiratory depression and possessed extremely poor judgment and skill levels in his ability to manage and

13

maintain an adequate airway which caused the death of Ms. Taylor." These examples do not constitute a complete itemization of the causation opinions in Dr. Byrne's report. There are still more, which we do not detail here. Finally, Dr. Byrne concluded, "It is my opinion that Dr. Walters'[s] negligent acts are responsible for the demise of Ms. Elizabeth Taylor."

Viewing the information set forth within the four corners of Dr. Byrne's report, we hold that the trial court did not abuse its discretion by determining Dr. Byrne's report provides a fair summary of his expert opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 878. The trial court did not abuse its discretion by determining that Dr. Byrne's report constitutes an objective good faith effort to satisfy the two purposes of section 74.351. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351.

The cases cited by Dr. Walters for the contrary position are not applicable here. *See Clark v. HCA, Inc.*, 210 S.W.3d 1, 11 (Tex. App.—El Paso 2005, no pet.) (holding expert report did not causally link alleged negligent use of Lovenox to compartment syndrome alleged as injury from doctor's negligence); *Barko v. Genzel*, 123 S.W.3d 457, 458–59 (Tex. App.—Eastland 2003, no

14

pet.) (holding expert report did not causally link plaintiff's claims that doctor negligently failed to diagnose and treat back injury to miscarriage alleged as injury from doctor's negligence); *Windsor v. Maxwell*, 121 S.W.3d 42, 46–50 (Tex. App.—Fort Worth 2003, pet. denied) (holding expert report did not causally link plaintiff's pleaded facts to intimal injury to left vertebral artery alleged as injury from doctor's negligence); *Zavala v. Pinkerton*, No. 03-05-00169-CV, 2007 WL 2010832, at *2 (Tex. App.—Austin July 10, 2007, no pet.) (mem. op.) (holding expert report did not causally link plaintiff's claim of negligent wisdom tooth extraction "to the chronic facial pain, internal derangement of the right and left temporomandibular joints and other harm" alleged as injuries from dentist's negligence); *Meyers v. Golden Palms Ret. & Health Ctrs., Inc.*, No. 13-06-00289-CV, 2007 WL 1500819, at *3 (Tex. App.—Corpus Christi May 24, 2007, pet. denied) (mem. op.) (holding expert report did not show causal link between plaintiff's claim of nursing home employees' negligent performance of a transfer of plaintiff from wheel chair to the broken femur alleged as injury from negligence).

Here, unlike the expert reports in *Clark*, *Barko*, *Windsor*, *Zavala*, and *Meyers*, Dr. Byrne's report does causally link Dr. Walters's standard of care violations to the injury—death—alleged to have occurred as a result of Dr. Walters's negligence. As set forth above, and demonstrated in the report

15

attached to this opinion as Appendix A, Dr. Byrne's report itemizes and then discusses in detail nine specific standard-of-care violations by Dr. Walters: failure to appropriately classify the pre-operative physical risk status of Ms. Taylor; failure to consider the increased risks of office-based general anesthesia in a morbidly obese patient; failure to properly assess the status of Ms. Taylor's asthmatic bronchitis prior to administering general anesthesia; failure to train and rehearse his office staff in emergency procedures; failure to monitor Ms. Taylor's vital signs while she was under general anesthesia; failure to properly treat Ms. Taylor's respiratory emergency by not immediately administering reversal agents, not establishing an intubated airway, and not providing adequate respiratory support; failure to maintain flumazinil (Romazicon) medication on his "crash cart;" failure to properly perform advanced cardiac life support on Ms. Taylor; and failure to use prudent medical judgment by choosing to use general anesthesia on Ms. Taylor for "the simple removal of a tooth." After each section of the report discussing each of these nine standard of care violations, Dr. Byrne's report links the standard of care violation specifically to the facts of Ms. Taylor's death. Dr. Byrne's factually specific causation opinions are not conclusory. *See Arkoma Basin Exploration Co. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 392 n.32 (Tex. 2008) (defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which

16

the inference is based"); *see also, e.g., Mosley v. Mundine*, 249 S.W.3d 775, 781 (Tex. App.—Dallas 2008, no pet.) (holding expert report sufficient on causation element); *Grindstaff v. Michie*, 242 S.W.3d 536, 544 (Tex. App.—El Paso 2007, no pet.) (same); *Patel v. Williams*, 237 S.W.3d 901, 906 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (same); *Bidner v. Hill*, 231 S.W.3d 471, 474 (Tex. App.—Dallas 2007, pet. denied) (same).

Moreover, this is not a case like *Clark*, *Barko*, *Windsor*, *Zavala*, or *Meyers*, where the injury alleged by the plaintiff did not necessarily follow from the negligence alleged by the plaintiff. Here the negligence alleged all relates to Dr. Walters's administration of office-based general anesthesia to Ms. Taylor. The injury alleged, the death of Ms. Taylor from respiratory depression induced by drugs administered by Dr. Walters, flows—as opined by Dr. Byrne—directly from Dr. Walters's negligent administration of those drugs in an office-based general anesthesia and from Dr. Walters's negligent care for Ms. Taylor during general anesthesia and after she suffered respiratory distress. An "expert report does not need to marshal all the evidence necessary to establish causation at trial," it must only "contain sufficiently specific information to demonstrate causation beyond mere conjecture." *Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.*, 224 S.W.3d 448, 453 (Tex. App.—Fort

17

Worth 2007, no pet.) (citing *Wright*, 79 S.W.3d at 52). Dr. Byrne's report more than adequately meets this standard.

Concerning Dr. Walters's contention that Dr. Byrne's report is inadequate because it "fails to rule out other possible causes of Ms. Taylor's death," no such requirement exists, even at trial in a medical negligence case. In a medical malpractice case, the plaintiff must prove by competent testimony that the defendant's negligence proximately caused the plaintiff's injury. *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988) (citing *Hart v. Van Zandt*, 399 S.W.2d 791, 792 (Tex. 1965) and *Bowles v. Bourdon*, 148 Tex. 1, 5, 219 S.W.2d 779, 782 (1949)). The plaintiff must establish a causal connection beyond the point of conjecture; proof of mere possibilities will not support the submission of an issue to the jury. *Duff*, 751 S.W.2d at 176. The plaintiff is required to show evidence of a "reasonable medical probability" or "reasonable probability" that his or her injuries were proximately caused by the negligence of one or more of the defendants. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995). But a plaintiff is not required to establish causation in terms of medical certainty, nor is he or she required to exclude every other reasonable hypothesis. *Bradley v. Rogers*, 879 S.W.2d 947, 954 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *King v. Flamm*, 442 S.W.2d 679, 682 (Tex. 1969)). Dr. Walters has cited no authority, and we have located none,

18

indicating that an expert report must "rule out other possible causes of Ms. Taylor's death" in order to be adequate under chapter 74. Moreover, Dr. Byrne's report specifically explains that "the autopsy performed by the Tarrant [c]ounty Medical Examiner ruled out a catastrophic cause of death such as a stroke or a myocardial infarction and physical and microscopic findings were consistent with respiratory and cardiac arrest."

Concerning Dr. Walters's contention that Dr. Byrne's report is inadequate because it "fails to explain how Dr. Walters'[s] failure to appropriately treat Ms. Taylor's respiratory depression caused her death," we simply cannot agree; Dr. Byrne's report specifically explains that Dr. Walters failed to appropriately treat Ms. Taylor's respiratory depression by failing to administer reversal agents, failing to establish an intubated airway, failing to provide adequate respiratory support, failing to properly administer advanced cardiac life support, and failing to train his staff in emergency procedures. Dr. Byrne's report specifically opines that each of these acts caused the death of Ms. Taylor by preventing adequate ventilation of Ms. Taylor and allowing her oxygen saturation to drop below an acceptable level.

Concerning Dr. Walters's contentions that Dr. Byrne's report is inadequate because it "omits any explanation for how Dr. Walters'[s] administration of general anesthesia proximately caused Ms. Taylor's death," "contains a large

19

analytical gap in that he failed to explain how Dr. Walters'[s] administration of Versed, Fentanyl, and Propofol proximately caused Ms. Taylor's death," and "fails to flesh out how Dr. Walters'[s] administration of general anesthesia and failure to respond to Ms. Taylor's respiratory depression caused Ms. Taylor's death," Dr. Byrne's report speaks for itself. As explained above, Dr. Byrne's report details exactly how Dr. Walters's administration of general anesthesia caused Ms. Taylor's death. These contentions are simply variations of the same challenges to Dr. Byrne's report that we have rejected.

Concerning Dr. Walters's contention that Appellee is somehow prohibited from using an expert report paid for and prepared for the Texas State Board of Dental Examiners, we have found no authority for this contention and Dr. Walters has cited none. And Dr. Byrne's report expressly states,

> While there are similarities, it is my opinion that a case review for a licensing board is different from that of a civil negligence case. The licensing board is not only concerned about causal negligent acts and damages to a patient as in a civil litigation, I believe they are also concerned about other acts which demonstrate a practitioner's fund of knowledge, medical judgment, clinical skill, trend of practice, and attitude toward patient care in an effort to meet their charge to protect the public.
>
> Therefore, in my report I will also list all standard of care violations I note in this case committed by Dr. Walters, be they causal to damage or not . . . .

20

Thus, Dr. Byrne's report does include a "Standard of Care Violations–Section 1," which addresses Dr. Walters's violations of standards of care relevant to the State Board's rules. We did not utilize these standard of care violations in our analysis of Dr. Byrne's report. And Dr. Byrne's report contains a "Standard of Care Violations–Section 2" in which Dr. Byrne explains, "In this section I list and discuss the 'standard of care' violations committed by Dr. Walters which led to Ms. Taylor's demise." These standard of care violations and their corresponding specific factually based causation opinions form the basis of our analysis of the adequacy of Dr. Byrne's report. Accordingly, although Dr. Walters may be correct that the section 1 standard of care violations are not applicable to a health care liability claim, the section 2 standard of care violations clearly are.

We overrule the remainder of Dr. Walters's sole issue.

## VI. CONCLUSION

Having overruled Dr. Walters's sole issue, we affirm the trial court's order denying Dr. Walters's motion to dismiss.

SUE WALKER
JUSTICE

PANEL: GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: January 22, 2009

21

**APPENDIX**

# ORAL & FACIAL COSMETIC SURGERY CENTER

Cosmetic & Reconstructive Surgery of the Face • Removal of Impacted Teeth • Dental Implants • Orthodontic Surgery • TMJ Surgery

**Roger P. Byrne, DDS, MD**
Board Certified
American Board of Oral & Maxillofacial Surgery

February 17, 2006

Office of Chief Medical Examiner
Tarrant County Medical Examiner's District
200 Feliks Gwozdz Place
Fort Worth, Texas 76104-5713

      Re: Elizabeth Taylor, Case No. 0510525 ·

Dear Dr. Pirawani:

As you are aware, from our recent discussion, I am acting as an expert witness on behalf of the State Board of Dental Examiners in the referenced case. After a review of your autopsy report, I feel the manner and cause of death are not fairly represented based on the actual facts in this case.

I have enclosed a copy of my expert opinion report and the pertinent patient record. I would appreciate your panel review of th    information which may provide additional facts for which your office is unaware.

I would be happy to answer questions or make myself available if required. I look forward to hearing from you on this matter.

Sincerely,

Roger P. Byrne, DDS, MD

2450 Fondren, Suite 130
Houston, Texas 77063

**EXHIBIT**

A 33

0510525

February 13, 2006

Ms. Lisa Jones
Director of Enforcement
State Board of Dental Examiners
333 Guadalupe, Tower 3, Suite 800
Austin, TX 78701-7452

   Re: TSBDE Case #06-0200-1107

Dear Ms. Jones:

   Per your request, I have reviewed the documentation provided in your investigative file regarding the death of Elizabeth S. Taylor, Age 41 while undergoing oral surgery for the removal of the lower left third molar by Stephen C. Walters, DDS.

   As a means to more fully understand the facts from the investigative file, I will include a time oriented "sequence of events." Because there are not definitive documents in this case (time oriented anesthesia record and emergency record), the actual times (other than the arrival time of Ms. Taylor on 11/4/05 and the EMS documentation) are variable because they are based on recollection of the parties after the fact.

   While there are similarities, it is my opinion that a case review for a licensing board is different from that of a civil negligence case. The licensing board is not only concerned about causal negligent acts and damages to a patient as in a civil litigation, I believe they are also concerned about other acts which demonstrate a practitioner's fund of knowledge, medical judgment, clinical skill, trend of practice, and attitude toward patient care in an effort to meet their charge to protect the public.
   Therefore, in my report I will also list all standard of care violations I note in this case committed by Dr. Walters, be they causal to damages or not in an effort to assist the Board in evaluating the above factors.

   My medical opinions are based on reasonable medical probability, my education as a dentist and physician, my training as an oral and maxillofacial surgeon, my knowledge of the office-based ambulatory anesthesia standard of care and my experience in performing office-based anesthesia since 1973. I have attached a copy of my curriculum vitae to be made a part of this report.

**34**

26

## Sequence of Significant Events

### 10/31/05      Initial Examination

1:30 PM     Ms. Taylor completes patient information, insurance benefit information and health history office forms

*Medical History form*: 5'3", 290 pounds, Heart murmur, high blood pressure, chest pain/angina, irregular heart beat, bronchitis, asthma, snoring/sleep apnea, smokes, bruises easily, chronic fatigue, on a diet, and has taken diet pills. Last physician visit 7/05 for asthmatic bronchitis
Medications: Coreg, Lotrel, Lasix, Advair

*Clinical examination form* is completed in the handwriting of Susan Sevier for Dr. Walters (his signature is absent), no vital signs are recorded, panoramic x-ray done, Plan notes IV/LAX 2 therapy

*Dr.Walters' statement* agrees basically with health history form. He states he noted breathing was normal with some expiratory wheezing and she uses "nebulizer" treatments. He recommended intravenous and local anesthesia. He noted pre-operative instructions to include NPO status 8 hours prior to surgery, take regular medications with sip of water and take her breathing treatment as well as taking a copy of the consent form home to read.

*Dr. Walter's M&M interview form* states he had concerns prior to his care about the patient's medical condition including CVD, HTN, Asthma, and bronchitis.

*Progress note* entry in the handwriting of Susan Sevier is not initialed nor is there evidence Dr. Walters was aware of the note. It states consult for surgical removal of #17 and prescriptions were given to patient (EES 400, Lortab 7.5)

*Dr. Walters' statement* states he explained the procedure and risks to Ms. Taylor and she was given the consent to take home and read. There are no notes in the record concerning "informed Consent" at this visit to document the communications

**35**

27

## 11/04/05 Surgery Appointment

*Dr. Walters' statement notes the monitor clock was one hour ahead because of the time change. Therefore, all times in this sequence reflect this change.*

**7:59AM**     *Print-out* Initial vital signs are presented with a blood pressure of 136/72 but there is no date or name on the print out. It is submitted as if it were part of Ms. Taylor's record.

**8:00 AM**     *Dr.Walters statement* Scheduled time of appointment

**8:25 AM**     *Dr.Walters and Teresa Walters statements* Patient signs in, signs consent, confirms taking medications with a sip of water and her nebulizer treatment as instructed (According to Dr. Walters statement, the record shows Ms. Taylor signed in at 8:15AM but he discovered the clock was 15 minutes slow)

**8:30AM**     *Dr. Walters' statement* –Ms.Taylor was taken to room 2, was relatively calm, and BP read 177/95, pulse 107, respiration 20, and $O_2$ Sat 97%. $O_2$ with nasal hood was placed over her nose.

**8:44AM**     *Print-out* initial vital signs(after that noted at 7:59AM) submitted as a part of Ms. Taylor's record does not have a date or name present on the record. It shows vital signs of a pulse rate of 107 and a $S_aO_2$ of 97%.

**8:45AM**     *Dr. Walters' M&M interview form* notes he began IV attempts at 8:45AM and IV finally completed it at 9:55AM (1 hour and 10 minutes)

               *Dr. Walters' statement* notes it took him 40-45 minutes to finally start the IV.

               *It should be noted Susan Sevie's statement describes the multiple attempts (four) to start an Intravenous line with the administration of Fentanyl on the 2nd aborted attempt and Versed on the 3rd aborted attempt before proceeding with the full doses of Versed, Fentanyl and Propofol after the successful 4th attempt.*

**8:49AM**     *Print-out* Vital signs indicated a blood pressure of 177/95, pulse rate of 97, respirations of 27, and an $S_aO_2$ of 95%.

               *Anesthesia record* sort of goes along with this time frame as it notes a BP 177/95, but deviates by listing a pulse of 107, $S_aO_2$ 97%, Respiration 20, and ECG with NSR (normal sinus rhythm).

3

**36**

*Susan Sevier's statement* notes the BP was 177/95 after she replaced the initial cuff with a larger one because the alarm went off. Where are these readings?

8:54AM    *Print-out* Vital signs indicated no blood pressure reading, respiration of 31, Pulse rate of 100, and no $S_aO_2$ reading.

8:59Am    *Print-out* Vital signs indicated no blood pressure reading, respirations of 25, pulse rate of 97, and no $S_aO_2$ reading . **It should be noted this is the last vital signs recorded on the print-out which was 6 minutes prior to the Versed 5mg, Fentanyl 0.1mg, and Propfol 40-50mg being administered.**

9:50AM    *Teresa Walters,* she state she was called to room 2 to assist with the emergency at approximately 9:50AM. This is not within other time guidelines.

        *Dr. Walters M&M Interview form* states the 6 liters of oxygen was placed on the patient at 9:50AM. This conflicts with other statements regarding the emergency event.

9:55AM    *Anesthesia record* completed by Susan Sevier indicates the IV medications were administered: Versed .5mg, Fentanyl .001mg, Diprivan 5cc. There were no dosages listed on the record for local anesthesia

        *Dr. Walters' statement* reflects he gave Versed (5mg/1cc), sublimaze (Fentanyl) 0.1mg/2cc, propofol 40mg/4cc and xylocaine 2% (no amount listed) + one carpule Marcaine 0.5%

        *Dr.Walters M&M Interview form* states he administered 2 carpules of 2% xylocaine and Marcaine 0.5% (no dosage)

        *Dr. Walters' statement* notes after the general anesthesia and local anesthesia medications were administered, the surgical tooth removal was started when the blood was noted to be dark, the $S_aO_2$ started to drop, and the patient was not breathing. Positive pressure ventilations via nasal mask were performed. An oral airway was inserted shortly thereafter to assist with the airway. A nasal airway was also inserted. The $S_aO_2$ continued to drop. Dr. Lane entered the room and he assisted ventilation by lifting the jaw. EMS 911 was called. Heart rate progressed from 107 to near 40. Atropine 1mg was given IV. Brachial pulse was palpated at 80. Two intubation attempts

4

**37**

were made but failed. There was no $S_aO_2$ reading at this time. Ventilations were continued until EMS arrival.

**Susan Sevier's statement** notes when the oxygen saturation was 86%, they stopped surgery and started bagging the patient with oxygen. The oxygen saturation continued to go down so they sat the chair upright and she went to get an oral airway. At this point Amy came into the room to help with the airway. The oxygen saturation was 38%. Amy left to bring crash cart. Dr.Walters then instructed her to get a full face mask. Amy grabbed the portable oxygen and ambu bag. The pulse oximeter stopped reading. The sensor was moved around. The whole time the patient had a heart rhythm and pulse. Teresa called and enters room. She has sensor moved. She requested a nasal airway and Amy put it in. Teresa left to get Dr. Lane. Dr. Lane enters room and started helping with airway. Dr. Lane then requested that 911 be called (Susan left and called). Teresa instructed her to get two separate pulse oximeters and bring to the room.

**Teresa Walters, RN, statement** noted on entering the room Ms. Taylor was being ventilated with 100% oxygen and full face mask. ECG indicated a rate of 41 with no reading on pulse oximeter. A nasal airway was placed after Dr. Lane came to room. EMS 911 was called. She palpated a heart rate of 80. Intubation was attempted two times. Atropine 1mg was administered just prior to EMS arrival.

**Teresa Walters patient death Interview form** in question #8 states, "pulse oximeter, EKG, BP cuff was not on patient when I entered the room."

**Amy Witherspoon's statement** notes she bagged the patient while Dr. Walters tried to position the patient's head. Dr. Walters attempted an intubation but aborted it. Dr. Lane instructed Susan to call 911. She states there was a heart rhythm at a rate of 33. Dr. Walters gave the patient 2mg of atropine. Dr. Walters again attempted an intubation. As the paramedics entered they removed the tube because it was in her stomach.

**Dr. Lane's statement** notes he entered room 2 and found the patient being bagged. He immediately assisted with a jaw lift while attempted ventilation continued. He requested 911 be called. He notes patient already had and oral and nasal airway in place. He notes Dr. Walters made two attempts to intubate the patient. The tube was removed and attempted ventilation was continued.

5

**38**

| | |
|---|---|
| 9:56AM | **EMS record** EMS received call |
| 9:58AM | **Dr. Walters' M&M Interview form** states the incident occurs at approximately 9:58AM |
| 10:00AM | **Dr. Walters' M&M interview form** states ambu bag and portable oxygen placed between 10:00-10:05AM. |
| 10:02AM | **EMS record**EMS at the scene |
| 10:05AM | **Dr. Walters' M&M Interview form** states the EMS arrived at 10:05-10:07AM · |
| 10:26AM | **EMS record** EMS leaves office with Ms. Taylor |
| 10:43AM | **EMS record** EMS at hospital with Ms. Taylor |
| 10:57AM | **Hospital record** pronounced dead |

## Sequence of Events Discussion

Clearly one can see by reading the retrospective reconstruction of the events by the parties the need for one definitive "time oriented" anesthesia and emergency record. It is also clear from a review of the facts: 1) no record of all drugs administered was maintained and timelines of administration are in question; 2) there was no recorded vital signs other than the earliest minutes of the procedure (basically baseline type); and 3) the emergency treatment by Dr. Walters and his staff was deficient. While it is not clear on the medical history evaluation by Dr.Walters, a concern without evaluation is not much different from no concern at all.

## Cause of Patient Death

The significant findings of the autopsy performed by the Tarrant County Medical Examiner ruled out a catastrophic cause of death such as stroke or a myocardial infarction and physical and microscopic findings were consistent with respiratory and cardiac arrest. Medical examiners may classify the manner of death in only one of four categories: natural, accidental, homicide, or suicide. In this instance, Gary Sisler,DO classified manner of death as "natural" with the cause of death being hypertensive cardiovascular disease. I disagree with the medical examiner in this instance. While the cardiac hypertrophy and the hypertensive disease may have contributed to this death, the initiating factor was respiratory depression, apnea and progressive hypoxia/hypercapnia leading to cardiac failure. The manner of death was accidental.

It is my medical opinion, based on the known sequence of events and reasonable medical probability, Ms. Taylor's death on 11/4/05 resulted from three separate, but obviously connected, findings: 1) morbid obesity, reactive airway disease, "difficult airway", possibly contributing obstructive sleep apnea, hypertension and cardiac hypertrophy; 2) Dr. Walters decision to perform an office-based operator-anesthetist general anesthesia on Ms. Taylor; and 3) respiratory depression, resultant apnea and hypoxia from the administration of

6



Versed, Fentanyl, and Propofol medications with a progressive spiral of decline into a life-threatening emergency which was not appropriately treated by Dr. Walters.

## Prior Board Orders

An Agreed Settlement Order, SBDE No. 01-749-0816DI, was entered by Stephen Walters, DDS and the SBDE on August 19, 2002. The Findings of Fact cited Dr. Walters for failing to keep adequate dental records specifically including a lack of blood pressure, no note on intra-operative respiration, no note on the use of nitrous oxide/oxygen analgesia, and no notes on multiple attempts to administer Versed were on June 1, 2001. The above deviations were blamed on the fact Dr. Walters prematurely returned to practice following personal health problems.

## Standard of Care Violations- Section 1

In this section, I list and discuss the record keeping "standard of care" violations to provide the Board an insight into Dr.Walters' practice philosophy and attention to the standards of care.

Dr. Walters failed to:
1) **Perform an initial limited physical evaluation on Ms. Taylor on 10/31/05.**
   *Discussion:*
   Under SBDE Rule 108.7(1)(B) all dentists are required to perform an initial limited physical evaluation which should include a blood pressure and heart rate as may be indicated. The purpose of the initial health care evaluation is to consider diseases or illnesses which may directly affect the decisions for treatment (i.e., general anesthesia) in oral surgery care. If medications are being taken to correct a medical problem, it is imperative for the clinician to evaluate their effectiveness (i.e., hypertension – three medications). In spite of the significant medical history of cardiovascular disease and hypertension being treated with three medications, Dr. Walters failed to see the need to take and record these vital signs on 10/31/05 before scheduling a general anesthesia on Ms. Taylor in spite of the fact he states, after the fact, he was concerned about her medical conditions.

   Dr.Walters' judgment not only violated SBDE rules, he placed Ms. Taylor at an increased risk for medical and anesthetic complications.

   It should be noted Dr. Walters replied in the affirmative on question #3 of the Dentist Interview which is incorrect.

7

**40**

2) **Maintain adequate medical records by failing to acknowledge in writing that he reviewed the medical history or limited physical exam.**

   *Discussion:*
   Oral and maxillofacial surgery standards of care require Dr. Walters to not only review the medical history and its significant findings, but to acknowledge in writing that he did so. This was not done in the record. In fact there is no "proof" he was aware of her significant medical history. On his health history form there is a place where he is to acknowledge that he reviewed Ms. Taylor's medical history and it is left blank.
   It should be noted he answered in the affirmative on the Dentist Interview that he performed and reviewed a thorough medical history but the blank space for his signature on his form documenting he reviewed the medical history is not signed.

3) **Acknowledge by his signature or personal written entry into the patient record that he was aware of the patient medical history, examination, treatment plan, or treatment performed.**

   *Discussion:*
   SBDE Rule 108.8(c) requires the dentist to provide documentation that a written review of the medical history and limited review of the physical exam was done. While I do not question the fact that Dr. Walters saw Ms. Taylor during his exam on 10/31/05 and performed a procedure on 11/4/05, there is no written entry by Dr. Walters in his handwriting, signature, or initial in the patient record including the medical history form, two progress note entries, the clinical examination record which has a place for his signature, the informed consent, or the anesthesia record which also has a place for his signature. It appears the staff is solely responsible for record documentation without direct supervision by Dr. Walters.
   These acts are a deviation from the standards recognized for appropriate patient record keeping and risk management. In my opinion, Dr. Walters increases the risks to his patients by these acts.

4) **Evaluate entries made by staff on the patient's progress notes which are not initialed or signed by that staff person.**
   *Discussion:*
   There are entries made in the patient record which are made by staff personnel and not Dr. Walters. The staff does not initial the entry nor does Dr. Walters acknowledge he was aware of such an entry. These acts are a deviation from the standards recognized for appropriate patient record keeping and risk management.
   In my opinion, Dr. Walters increases the risks to his patients by these acts.

8

**41**

5) **Appropriately acknowledge in the record that the components of the "Informed consent" were provided to the patient.**

*Discussion:*

The standard of care requires the informed consent be a "process" and consist of more than simply a form signed by the patient. Dr.Walters' consent form only has a place for the patient to sign without a space for a staff witness or Dr. Walters to acknowledge the process. There is, as already noted, no note in the record by Dr. Walters that he was involved in the patient communication. However, in his personal statement he claims he discussed the risks with Ms. Taylor. The form was sent home with the patient to read and then sign on the date of surgery. In fact, Ms. Taylor did sign the form on 11/4/05.

It is my medical opinion Dr. Walters was not involved in the consent process and did not fully discuss the medical risks that Ms. Taylor had which clearly deviates from the standard of care.

6) **Maintain a time oriented anesthesia record for Ms. Taylor on 11/4/05 or the appropriate recording of vital signs and medications.**

*Discussion:*

SBDE Rule 108.34(c)(2)(c)(C) requires a dentist performing a general anesthesia to maintain a time oriented written anesthesia record for: 1) drugs and dosages utilized; and 2) physiologic vital signs. Dr.Walters anesthesia record is bifurcated. On one page he has a time oriented section for surgery start and end time with medication administered and a separate printout of vital signs related to event time. However, in Ms. Taylor's record, the time oriented record was not completed so no one really knows for certain at what time medications were administered. The part of the record for local anesthesia dosage was also blank for amount or time given. The print out offered as the vital sign record of Ms. Taylor has no name on the print out or date. Therefore, one does not truly know if it is her record or not. As pointed out in the sequence of events recorded vital signs on the print-out were all prior to the final medication dosage and the emergency event. Oxygen saturation was missing after 9:49 A.M. and there were no values recorded during the actual anesthesia or hypoxic event.

There were data entry errors (Susan Sevier) on the anesthesia record. Examples include: 1) Versed 0.5mg is recorded on the record but the correct dose is 5mg; 2) Fentanyl 0.001mg is recorded when 0.1mg was administered; 3) Diprivan 5cc or 50mg is recorded on the record while Dr. Walters contends he administered only 4cc/40mg in his personal statement.

It must also be noted Dr. Walters had an agreed settlement order against him on a similar issue. Obviously he did not learn his lesson!

The anesthesia record keeping in this case, because it is general anesthesia, is absolutely the worst I have seen. In my medical opinion, Dr.

9

**42**

Walters continues to severely deviate from the standard of care in this area and clearly places his anesthesia patient at significant risk.

7) **Maintain two individuals, other than Dr. Walters, currently certified in BCLS present in the delivery of anesthesia care.**
   *Discussion:*
   SBDE Rule 108.34(c)(3)(C)(ii) requires two individuals, currently certified in BCLS, other than Dr. Walters, to be present in the operating room while a general anesthesia is administered. From the record, only one person was admittedly present (Susan Sevier) in the operating room while the general anesthesia was performed. It was not until an emergency occurred that other staff came into the room. Dr. Walters not only violates the SBDE rule, but his failure clearly illustrates the purpose of the rule. With only a single staff member present, the duty of surgical assisting, monitoring of the patient's vital signs, and maintaining an appropriate anesthesia record cannot be accomplished. This fact should be extremely clear after reading and trying to figure out what happened in this case.
   It is my medical opinion the lack of concern to meet this standard of care by Dr. Walters places his patients under anesthesia at significant risk.

8) **Maintain a person dedicated to recording required intra-operative information on the anesthesia record.**
   *Discussion:*
   SBDE Rule 108.34(c)(3)(C)(iii) requires one of the two individuals present, as noted above, must monitor the patient and record the required information. This was not done by Dr. Walters as required under board rule.
   It is my opinion for the same reasons cited in #7, Dr. Walters placed his patients at significant risk.

9) **Note the administration and/or dosages of Versed and Fentanyl during the failed intravenous access attempts.** .
   *Discussion:*
   As already noted in #6-8, inadequate anesthesia record keeping occurred. In the provided statement by Susan Sevier, she describes Dr. Walters four attempts to obtain intravenous access. On the second attempt to obtain an IV, Fentanyl was administered. No dosage was recorded. On the third attempt, Versed was administered and again no dosage was recorded. On the forth attempt, IV access was obtained and new Fentanyl and Versed dosages were administered in the amounts of 0.1mg and 5mg respectively. Any dosage administered in the tissue must still be counted toward an overall patient dosage. In fact no one really knows how much Versed and Fentanyl was administered to Ms. Taylor. If the total initial dosage prepared was not administered in the aborted intravenous access attempts, the remaining medication (wastage) must also be recorded. In my opinion,

10

43

the "extra" respiratory depressant unaccounted for in the aborted intravenous access attempts was cumulative to a second dosage and contributed to Ms. Taylor's respiratory depression.

It is my opinion the failure to accurately assess and record all medication administered to a patient places Dr. Walters' patients at significant risk.

10) **Note the wasted controlled medication on the anesthesia record.**
*Discussion:*

Under state and federal law, dentists are required to keep a log on all controlled medication either administered to a patient or wasted in the procedure. If this wastage is not recorded on the anesthesia record, I would anticipate an accurate drug record is not maintained as well. Obviously, this would require a further record evaluation.

11) **Record accurate information on the anesthesia record as if parts of it were completed by a staff person in advance of the procedure.**
*Discussion:*

Based on my evaluation of the anesthesia record, it is my opinion parts of the record were completed prior to the procedure. For example, the record states routine post operative instructions were given to Ms. Taylor, she was discharged with Pam (her friend), and she is to return for a post operative visit in one week. This fact, coupled with the number of inaccuracies on the record (initial vital signs, medication dosage, time of start, lack of certain blanks completed) illustrate improper staff training by Dr. Walters. This deviation in the standard of care is another example of placing patients at significant risk.

12) **Maintain an appropriate patient record of the intra-operative complication.**
*Discussion:*

Other than the personal statements of the parties, no official record of the emergency events existed in the patient record. The standard of care requires a time oriented emergency record be kept recording the time of occurrence, vital signs, medication administered, intubation (or attempts), and other procedures performed. Hopefully the need for this standard is clear after looking at the recollection of events of the parties. There is no substitute for accurate records.

The lack of appropriate record keeping throughout this case has been astounding and once again goes to the poor staff training and lack of concern by Dr. Walters for appropriate patient care in an operator-anesthelist office-based general anesthesia. In spite of his prior Board action, he has not changed his method of practice.

11

**44**

## Standard of Care Violations – Section 2

In this section, I list and discuss the "standard of care" violations committed by Dr. Walters which led to Ms. Taylor's demise. Each one listed is critically on point to Dr.Walters' fund of knowledge, judgment, and profession skills.

Dr. Walters failed to:
1) **Appropriately classify the pre-operative physical risk status of Ms. Taylor.**
   *Discussion:*
   SBDE Rule 108.34(c)(3)(A) requires patients under general anesthesia to be suitably evaluated prior to the procedure. It is my opinion Dr.Walters did not suitably evaluate Ms.Taylor prior to general anesthesia.
   There is an entry on Dr. Walters' Anesthesia/Surgery Record that Ms. Taylor is an ASA II physical risk classification. This is, by definition, a person who demonstrates mild systemic disease and no functional limitation. It is my medical opinion a morbidly obese patient (5'3", 290 lbs.) with heart disease, angina, irregular heart beat, hypertension on three medication therapy (Coreg, Lotrel, Lasix), asthmatic bronchitis with recent complications along with a smoking history, possible obstructive sleep apnea, and chronic fatigue fails to qualify as an ASA II classification. I would classify Ms. Taylor as an ASA IV and if one were liberal, an ASA III. She was never an ASA II physical status! I question whether or not Dr. Walters even determined the ASA II status or if this is something that his assistant simply wrote down as she filled in the form. Further questioning in this area is required. At any rate, the appropriate ASA classification for Ms. Taylor negated the utilization of an office-based operator-anesthetist general anesthetic.
   It is my opinion Ms. Taylor should have had the tooth removed under a local anesthesia or possibly a conscious sedation and local anesthesia because of her significant general anesthesia medical risks.

2) **Appropriately consider the increased risks associated with office-based general anesthesia in a morbidly obese patient: difficult venous access, difficult airway management, and the difficult lung mechanics of the obese patient in a supine position.**
   *Discussion:*
   Dr. Walters did not enter any discussion in the record of Ms. Taylor's significant medical history findings or a discussion of his concerns about general anesthesia for this patient. He also did not discuss his rationale or justification for recommending a general anesthesia versus a local anesthesia. However, after the fact, on Dr.Walters' M&M form he states he had concerns about her medical problems. If this is true, why would he recommend a general anesthesia? It should be noted at this point, he only has two options on his consent form, local or general anesthesia. In my medical opinion Dr. Walters did not consider Ms. Taylor's significant medical

12

**45**

history or morbid obesity in his decision to perform a general anesthesia. This failure in judgment was proven by the facts: multiple venous access attempts were necessary; respiratory depression occurred which could be related, in addition to the medications, the supine overburden on lung mechanics; and two failed attempts at the intubation of Ms. Taylor's difficult airway.

In my medical opinion, Dr. Walters had an inadequate fund of knowledge, demonstrated poor clinical judgment, and possessed extremely low skill levels in his ability to manage and maintain a difficult airway which caused the death of Ms. Taylor.

3) **Appropriately proceed with a general anesthesia on a patient who had asthmatic bronchitis, smokes, and expiratory wheezing on the initial exam without documenting the status of the asthmatic bronchitis through chest auscultation prior to anesthesia induction.**
*Discussion:*

Dr. Walters' wife, an R.N., notes in her statement that Ms. Taylor had performed a morning inhalation breathing treatment as instructed by their office on 11/4/05. If such a treatment was ordered by Dr. Walters on the morning of the surgery, he must have had a concern for her asthmatic bronchitis status. He did mention it in his personal statement, prepared after the fact, he requested she perform a breathing treatment on the morning of surgery. There was, of course, no notes in the record on this order. Was this concern based on a lung examination on 10/31/05 or simply his statement that she had expiratory wheezing? In my medical opinion, Dr. Walters violated the standard of care by ordering the patient to perform a breathing treatment and then failing to check the effectiveness of that treatment (simple lung auscultation) prior to performing a general anesthesia. Therefore, we have no way to know if pre-operative bronchospasm was present or not. If it was present, did it contribute to Dr.Walters inability to ventilate Ms. Taylor adequately with an oral airway, nasopharyngeal airway and a positive pressure breathing apparatus (Ambu bag)?

In my medical opinion, Dr.Walters demonstrated poor clinical judgment which, in reasonable medical probability, contributed to the death of Ms. Taylor.

4) **Appropriately train and rehearse his office staff in emergency procedures.**
*Discussion:*

Dr. Walters submitted a copy of his Emergency plan which is totally inadequate for a life-threatening emergency. Clearly, either he does not understand the contents of an emergency plan or he doesn't care.

Both Susan Sevier and Amy Witherspoon acknowledge in there interview questions they had rehearsed emergency care. However, Teresa Walters, R.N., left this question blank.

13

46

The sequence of events analysis make clear to the observer Dr. Walters had not trained his staff in emergency procedures. The standard of care dictates the oral surgeon should be responsible for calling a "code" (life threatening emergency) and every staff member at that point should have a known and rehearsed function for that code. As an example, at the point Dr. Walters became concerned about an airway/respiratory emergency progressing into a life-threatening situation, he should have called a code. The front office would immediately call 911. Other staff would be trained and in position to perform their duty assignments such as the recording of emergency procedures and drugs being performed, obtain the crash cart, prepare the drugs and syringes, maintain monitors, and assist in patient resuscitation. Analysis of the statements provided by the parties, total disorganization prevailed. The R.N. came in and gave orders instead of the oral surgeon in charge. A second surgeon (Dr. Lane) comes in late on the emergency event and has to be the one to request 911 be called. In my opinion, Dr. Walters likely panicked and it became necessary for others to take over the code functions.

In my opinion, the apparent lack of emergency training and performance by Dr. Walters and his staff caused Ms. Taylor's death.

5) **Appropriately monitor the patient's intra-operative physiologic vital signs while under general anesthesia.**

*Discussion:*

Under SBDE Rule 108.34 (c)(3)(D), continual monitoring of pulse oximetry, ventilation, BP/pulse , and ECG shall be documented on a time oriented anesthesia record every five minutes. It has already been established no time oriented anesthesia record was maintained in violation of this rule. It is clear no vital signs were recorded on the print-out during the actual anesthesia or emergency event. However, the discrepancy in the statements should be noted. There is mention of an $S_oO_2$ of 33% and a heart rate of 41 at points during the emergency event. The most important comment to me was that made by Teresa Walters, R.N.I She states upon entering the room, after the emergency event began, no blood pressure cuff, ECG, or pulse oximeter was on the patient. It must also be noted that she made another statement that the ECG showed a heart rate of 41 with no reading on the pulse oximeter.

There is no excuse for monitors to not have been in place with vital signs being recorded during a general anesthesia procedure. Dr.Walters poor judgment in this instance contributed to the death of Ms. Taylor.

14

**47**

6) Appropriately treat the respiratory emergency by not immediately administering reversal agents for respiratory depression due to narcotic and benzodiazepine medication, establishing an intubated airway with oxygen administration, and providing adequate respiratory support for the patient.

*Discussion:*

During general anesthesia where ventilation is not controlled by the anesthesiologist but is dependant on the patient's own respiratory drive, respiratory depression is not uncommon. It is first recognized by a drop in the oxygen saturation. This is corrected by appropriately ventilating the patient until the oxygen saturation returns to an acceptable level ($SaO_2 > 90\%$). Upon immediate recognition that one is unable to adequately control ventilation and the oxygen saturation is below an appropriate level, one must do two things: reverse any medication causing respiratory depression and establish an adequate airway to enable ventilation control (i.e., oral airways, nasal airways, endotrachial tune, LMA tube). The purpose for the medication reversal is to lessen the depression of the natural respiratory drive center located in the medulla oblongata of the brain.

It is my opinion Dr.Walters failure to initially administer reversal agents for the medications responsible for the respiratory depression increased the downward death spiral and caused the death of Ms. Taylor.

It is my opinion Dr.Walters failure to initially utilize a full face mask for ventilation control instead of using a nasal mask was a serious mistake of judgment and demonstrates poor skill in airway management which caused the death of Ms. Taylor.

It is my opinion Dr.Walters failure to maintain the skill to intubate Ms. Taylor successfully in this emergency event caused the downward death spiral and her death.

It is my opinion, Dr.Walters had an inadequate fund of anesthesia knowledge about respiratory depression and possessed extremely lporr judgment and skill levels in his ability to manage and maintain an adequate airway which caused the death of Ms. Taylor.

7) Maintain flumazinil (Romazicon) medication in his "crash cart."

*Discussion:*

In a review of the "crash cart" medication list provided by Dr. Walters, flumazinil is not listed.

It is my opinion any person performing general anesthesia in an office-based setting and utilizing benzodiazepine medication, should maintain this drug to reverse the effects of the medication (i.e., respiratory depression).

In my opinion, Dr. Walters demonstrates an inadequate fund of knowledge by his failure to not have flumazinil in his office while routinely utilizing benzodiazepines in general anesthesia procedures. This deviation not only contributed to the death of Ms. Taylor but places his anesthesia patients at significant risk.

15.

**48**

8) **Appropriately perform ACLS algorithm care for bradycardia and or PEA.**
   *Discussion:*
   While there is no heart rate recorded during the emergency, party statements indicate a significant bradycardia (rate 33-41) was noted. While Dr. Walters did administer atropine 2mg according to the written anesthesia record (wrong recommended ACLS protocol dosage), the condition did not seem to improve. However, a more important fact to address than the rate is the heart rhythm. No mention by any party commented on the rhythm.

   In fact, after the EMS arrived, they noted the presence of pulseless electrical activity (PEA). There is no mention of Dr. Walters following the ACLS protocol for refractory bradycardia or PEA nor is there any evidence that cardiac resuscitation was performed by either oral surgeon or staff member.

   It is my opinion Dr.Walters failure to recognize certain dysrhythmias that were likely present in a "failing" heart and to perform appropriate resuscitation illustrates a poor fund of knowledge and skill at ACLS management.

   It is my opinion Dr.Walters' deficiencies caused the death of Ms. Taylor and places his anesthesia patients at significant risk.

9) **Utilize reasonable and prudent medical judgment as compared to other oral and maxillofacial surgeons by choosing to utilize an intravenous general anesthesia procedure in a morbidly obese, medically compromised patient for the simple removal of a tooth.**
   *Discussion:*
   It is my opinion an ASA IV (or ASA III) physical risk patient who is morbidly obese is at extreme risk for life-threatening complications under general anesthesia in an office-based operator-anesthetist setting.

   It is my opinion Dr.Walters utilized extremely poor medical judgment by administering a general anesthesia to Ms. Taylor and this negligent decision caused her death.

   In this case, I either question Dr.Walters fund of anesthesia knowledge and related judgment or his total disregard for patient safety to make an additional fee for the general anesthesia. In either instance, Dr. Walters poses a significant risk to general anesthesia patients.

10) **Utilize reasonable and prudent medical judgment as compared to other oral and maxillofacial surgeons by administering a general anesthesia to a morbidly obese patient with a difficult airway and not recognizing this condition pre-operatively nor possessing the skill to intubate a patient with such a condition.**
    *Discussion:*
    For every oral and maxillofacial surgeon performing office-based general anesthesia, the "difficult airway" is always a concern and special courses are offered on the topic to illustrate this point. There is even a grading system

16

**49**

utilized by the American Association of Anesthesiologists. The "difficult airway" finding presents increased risks even in the best of providers. Unfortunately, Dr. Walters failed to recognize the difficult airway pre-operatively and had to encounter it on an emergency intra-operative basis.

It is my opinion, Dr. Walters demonstrated a deficient fund of knowledge by his failure to recognize a difficult airway, poor clinical judgment by his decision to perform general anesthesia in spite of a morbidly obese patient with a difficult airway, and deficient skills in emergency airway/ ventilation management.

This caused the death of Ms. Taylor and places his anesthesia patients at significant risk.

## Report Summary and Recommendation

It is my opinion Dr. Walters' negligent acts are responsible for the demise of Ms. Elizabeth Taylor. While she was morbidly obese and had significant medical problems, she would have survived, in all reasonable medical probability, the minor oral surgery procedure if: 1) a general anesthetic would not have been performed; and/or 2) Dr. Walters would have maintained the fund of knowledge, clinical judgment, and skill necessary to recognize and appropriately treat the difficult airway and respiratory depression with arrest.

It is my opinion Dr. Walters demonstrates an extremely low level of concern for the standard of patient care as illustrated by the overall sequence of events and the twelve violations noted in Section 1 of this report. This flippant attitude exists even after a previous SBDE order on point to the same issues.

While I fully acknowledge the Board's ability and right to make a determination in this case, I would like to offer my opinion for consideration by the Board because of the serious nature of the case.

The privilege, granted by the Board, of performing deep sedation/ general anesthesia in Texas is the livelihood of all oral and maxillofacial surgeons and dental anesthesiologists. We understand this privilege could be taken away by Board or legislative action if there is unreasonable documented public risk. Our profession, in addition to board rule, have set standards of care for those with this privilege. It is imperative, when one violates these standards in a significant manner as Dr. Walters has, swift and severe action must be taken, not only by the Board, but our profession.

It is my opinion Dr. Walters not only caused the death of Ms. Taylor, but is a significant risk to all of his patients under general anesthesia. Public protection should include an immediate removal of his ability to perform conscious sedation, deep sedation or general anesthesia until a formal hearing can address the facts. There is certainly Board precedence for licensure revocation after a due process hearing under the same or similar circumstances as noted in this case.

17

**50**



Report prepared and submitted by:

Roger P. Byrne, DDS, MS, MD

18

51

# CURRICULUM VITAE

## ROGER PATRICK BYRNE, D.D.S., M.S., M.D.

### PERSONAL INFORMATION

| | |
|---|---|
| Place of Birth | Fort Stockton, Texas |
| Date of Birth | September 22, 1944 |
| Father | Lewis Patrick Byrne |
| Mother | Lorice Jones Byrne |
| Children | Christopher Patrick Byrne — DOB October 10, 1970 |
| | Kimberly Ann Oquin — DOB January 30, 1975 |
| Home Address | 1211 "A" Nantucket |
| | Houston, Texas 77057 |

### PROFESSIONAL ACTIVITY

**Private Practice, Oral and Maxillofacial Surgery / Facial Cosmetic Surgery**
April 1993 - Present
2450 Fondren, Suite #130
Houston, Texas 77063
Telephone: (713) 266 - 1999   Facsimile: (713) 266 - 4408   E-mail: byrnoddsmd @ AOL. Com

**Clinical Associate Professor, University of Texas Health Science Center, Houston**
1993 - Present

### EDUCATIONAL DEGREES

**Medical Doctor (M.D.)**
Texas Tech University School of Medicine
May 1991
Lubbock, Texas

**Master of Science (M.S.)**
University of Texas Health Science Center
June 1973
Houston, Texas

**Doctor of Dental Surgery (D.D.S.)**
University of Texas Dental Branch
May 1969
Houston, Texas

**Bachelor of Science**
Texas A&M University
May 1965
College Station, Texas

## PROFESSIONAL LICENSES

**Texas State Board of Dental Examiners**
License # 9034
June 12, 1969 – Present

**Texas State Board of Medical Examiners**
License # J 1903
November 14, 1992 – Present

## BOARD CERTIFICATION AND FELLOWSHIPS

**Board Certification**
American Board of Oral and Maxillofacial Surgery
February 1974

**Fellowship**
American Association of Oral and Maxillofacial Surgeons
September 1974

**Fellowship**
International College of Dentists
September 1990

**Fellowship**
American College of Dentists
October 1992

## PROFESSIONAL EDUCATION AND TRAINING

**Fellow, Department of Surgery, Division of Plastic and Reconstructive Surgery**
Texas Tech University School of Medicine
July 1991 – June 1992
Lubbock, Texas

**Medical Student, Texas Tech University School of Medicine**
August 1988 – May 1991
Lubbock, Texas

**Private Practice, Oral and Maxillofacial Surgery**
July 1973 – August 1988
Corpus Christi, Texas

**Oral and Maxillofacial Surgery Training**
University of Texas Health Science Center
Houston, Texas
July 1972 – June 1973 Senior Resident, Ben Taub General Hospital
July 1971 – June 1972 Resident, The Methodist Hospital
July 1970 – June 1971 Resident, Ben Taub General Hospital
July 1969 – June 1970 Inter, University of Texas Dental Branch

**Student, University of Texas Dental Branch**
September 1965 – May 1969
Houston, Texas

2

## RESEARCH ACTIVITY

**Masters of Science Thesis**
**"Retrospective Analysis of Mandibular Fractures"**
1969 – 1970
University of Texas Health Sciences Center
Houston, Texas

**Department of Anatomy Grant**
**" Surgical Viability of Small Bowel Transplantation with Immunosuppression "**
Summers, 1966, 1967, 1968
H.L. Brockman, M.D., FACS
University of Texas Health Science Center
Houston, Texas

## PUBLICATIONS

**"Osseointegrated Implants"**
Jan 1998, Feb 1998, May 1998 (3 part series)
Journal of the Greater Houston District Dental Society

**"The Expert Witness"**
Chapter, Clinics in Oral and Maxillofacial Surgery
W.D. Saunders, November 1995

**"Dental Auxiliary Monitoring of Nitrous Oxide-Oxygen Inhalation Conscious Sedation"**
Textbook, Published by Texas Dental Association
April 1992, Revised 1999

**"Central Adenoma of the Mandible"**
Oral Surgery, Oral Pathology, Oral Medicine
Vol 39:436, March 1975

**"The Ramus "C" Osteotomy of the Mandible"**
Journal of Oral Surgery
Vol 32:259, April 1974

**"Transpositional Genioplasty"**
Journal of Oral Surgery
Vol 32:145, February 1974

**"A Surgical Follow-up of Oculo-Nasal Dysplasia, A Deviant of Goldenhar's Syndrome"**
Journal of Oral Surgery
Vol 31:382, May 1973

**"Retrospective Analysis of Mandibular Fractures"**
Masters Thesis
University of Texas Health Science Center, Houston, Texas
1970

3

## ACADEMIC POSITIONS

**Clinical Associate Professor**
1993 - Present
University of Texas Health Science Center
Houston, Texas

**Clinical Faculty**
1989 - 1992
Texas Tech University School of Medicine
Department of Surgery
Lubbock, Texas

**Assistant Professor**
1983 - 1987
Oral Pathology (3 hours / week Lecture)
Del Mar Dental Hygiene Program
Corpus Christi, Texas

**Visiting Professor**
1975 - 1985
National University of Mexico – Dental
Mexico City, Mexico

## PROFESSIONAL ASSOCIATION MEMBERSHIP

**International College of Dentists**
1990 - Present
**American Dental Association**
1969 - Present
**American Medical Association**
1990 - 1996
**American Association of Oral and Maxillofacial Surgeons**
1974 - Present
**American Association of Dental Examiners**
1987 - 1990
**American College of Dentists**
1992 - Present
**American Society of Dental Anesthesiology**
1974 - 1985
**Southwest Society of Oral and Maxillofacial Surgeons**
1974 - Present
**Texas Dental Association**
1969 - Present
**Texas Medical Association**
1990 - 2002
**Texas Society of Oral and Maxillofacial Surgeons**
1974 - Present
**Greater Houston District Dental Society**
1993 - Present
**Harris County Medical Society**
1993 - 2002
**Nueces County Dental Society**
1971 - 1993

4

# HOSPITAL AFFILATIONS

**The Methodist Hospital**
1994 – Present
Houston, Texas

**The Methodist Hospital – Sugar Land**
2000 – Present
Sugar Land, Texas

**Memorial Hermann Memorial City Hospital**
2001 – Present
Houston, Texas

**Rosewood Medical Center**
1993 – 2000 (Hospital closed)
Houston, Texas

**Memorial Southwest Hospital**
1993 – 1996
Houston, Texas

**Houston Northwest Medical Center**
1983 – 1993
Houston, Texas

**University Medical Center**
1989 – 1992
Lubbock, Texas

**Spohn Hospital**
1973 – 1988
Corpus Christi, Texas

**Memorial Medical Center**
1973 – 1988
Corpus Christi, Texas

**Driscoll Children's Hospital**
1973 – 1988
Corpus Christi, Texas

**The Doctors Hospital**
1973 – 1988
Corpus Christi, Texas

**Southside Hospital**
1973 – 1988
Corpus Christi, Texas

**Surgical Dental Hospital**
1980 – 1988
Corpus Christi, Texas

5

# COURSES AND LECTURES PRESENTED

## "The Combined Approach of Orthodontics and Surgery to Correct Dentofacial Deformity"
August 1974 (16 hour lecture, 8 hour surgical demonstration)
Post Graduate Course, National University of Mexico School of Dentistry, Mexico City, Mexico

## "Orthognathic Surgery"
May 1975 (2 hours)
4th International Congress, National College of Surgeon Dentists, Mexico City, Mexico

## "Preprosthetic Surgery"
May 1977 (2 hours)
5th International Congress, National College of Surgeon Dentists, Mexico City, Mexico

## "Maxillary Orthognathic Surgery"
May 1979 (2 hours)
6th International Congress, National College of Surgeon Dentists, Acapulco, Mexico

## "Facial Trauma"
February 1980 (2 hours)
Initial Meeting of the Congress for Oral and Maxillofacial Surgery, Mexico City, Mexico

## "Temporomandibular Joint Disorders: Diagnosis and Surgery"
May 1983 (2 hours)
8th International Congress, National College of Surgeon Dentists, Acapulco, Mexico

## "State Licensure and Credentialing in Expanded Scope for the OMS"
September 1990 (3 hour Surgical Roundtable)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, New Orleans, Louisiana

## "Pediatric Facial Trauma"
August 1991 (1 hour)
Pediatric Grand Rounds, Texas Tech University School of Medicine, Lubbock, Texas

## "State Licensure and Credentialing in Expanded Scope for the OMS"
September 1991 (3 hour Surgical Roundtable)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Chicago, Illinois

## "Facial Trauma"
April 1992 (1 hour)
Surgical Grand Rounds, Texas Tech University School of Medicine, Lubbock, Texas

## "Risk Management for the Dental Practice"
July 1992 (8 hours)
Academy of General Dentistry Annual Meeting, San Antonio, Texas

## "The Dental Practice Act and the State Board of Dental Examiners"
January 1993 (30 minutes)
Greater Houston District Dental Society Monthly Meeting, Houston, Texas

## "The Minimum Standard of Care in Dentistry"
September 1994 (30 minutes)
Greater Houston District Dental Society Monthly Meeting, Houston, Texas

6

**"Non-Surgical Facial Rejuvenation"**
September 1994 (3 hour Surgical Roundtable)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Denver, Colorado

**"Non-Surgical Facial Rejuvenation"**
September 1995 (3 hour Surgical Roundtable)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Toronto, Canada

**"Non-Surgical Facial Rejuvenation"**
September 1996 (3 hour Surgical Roundtable)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Miami, Florida

**"Ethics In Dentistry"**
November 1997 (30 minutes)
Greater Houston District Dental Society Monthly Meeting, Houston, Texas

**"Credentialing – Integrating Facial Cosmetic Surgery Into An Existing OMS Practice"**
February 1998 (1 hour)
American Association of Oral and Maxillofacial Surgeons Annual Winter Meeting, Phoenix, Arizona

**"Integrating an Operating Room into an Existing OMS Office Practice"**
May 1999 (1 hour)
Edward Hinds, MD Memorial Annual Meeting, Houston, Texas

**"Office Based Out-Patient Major Oral and Maxillofacial Surgery"**
May 1999 (1 hour)
Edward Hinds, MD Memorial Annual Meeting, Houston, Texas

**"The Medically Compromised Dental Patient"**
June 1999 (16 hours as Featured Speaker)
Southwest Society of Oral Medicine Annual Meeting, San Antonio, Texas

**"How to Build an Oral and Maxillofacial Surgery Office"**
September 1999 (2 hours)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Boston, Mass.

**"Lip Augmentation"**
September 2000 (30 minutes)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, San Francisco, California

**"Orthognathic Surgery"**
November 2001 (2 hours)
National Association of Mexican Oral and Maxillofacial Surgeons, Acapulco, Mexico

**"Medicine"**
September 2000 (5 hours)
Louisiana State University HSC 26th Annual Review Course in Oral & Maxillofacial Surgery
New Orleans, Louisiana

**"Hospital Credentialing"**
September 2001 (1 hour)
American Association of Oral and Maxillofacial Surgeons Annual Meeting, Orlando, Florida

7

**"Medicine"**
November 2001 (5 hours)
Louisiana State University HSC 27th Annual Review Course in Oral & Maxillofacial Surgery
New Orleans, Louisiana

**"Facial Rejuvenation"**
March 2002 (2 hours)
University of Texas HSC OMS Residency Program, Houston, Texas

**"Medicine"**
September 2002 (5 hours)
Louisiana State University HSC 28th Annual Review Course in Oral & Maxillofacial Surgery
New Orleans, Louisiana

**"Pulmonary Disease and Office Based Anesthesia"**
September 2002 (30 minutes of Symposium)
American Association of Oral and Maxillfacial Surgeons Annual Meeting, Chicago, Illinois

**"All You Ever Wanted To Know About Facial Cosmetic Surgery"**
May 2003 (6 hours)
133rd Annual Session, Texas Dental Association Meeting, San Antonio, Texas

8

# PERSONAL & PROFESSIONAL HONORS

## TEXAS A&M UNIVERSITY

1964-1965
Arts and Sciences Council

## UNIVERSITY OF TEXAS DENTAL BRANCH- HOUSTON

1966
Honors in Gross Anatomy

1967-1968
Officer, Psi Omega Dental Fraternity

1969
Senior Student Award, American Society of Dental Anesthesiology

## UNIVERSITY OF TEXAS HEALTH SCIENCES CENTER

1972
Selected to Present, American Society of Oral and Maxillofacial Surgeons

1972 (January – March)
First American OMS Resident to be invited to North Wales for 3 month Fellowship

1972-1973
As resident had 3 articles selected by Journal of Oral Surgery for publication
As resident had 1 article selected for publication by Oral Surgery, Oral Pathology, Oral Medicine

## PROFESSIONAL ACTIVITIES IN CORPUS CHRISTI, TEXAS

1974-1988
Consultant in OMS, Corpus Christi State School

1977-1983
Chief of Dentistry, Memorial Medical Center Hospital

1977-1983
Secretary of Hospital Staff, Memorial Medical Center Hospital

1977-1983
Secretary of Medical Executive Committee, Memorial Medical Center Hospital

1976
Chief of Dentistry, Driscoll Children's Hospital

1976
Member, Executive Committee, Driscoll Children's Hospital

1980-1984
Chief of Staff, Surgical Dental Hospital

1980-1983
Chairman, Advisory Committee to Texas Medicaid Dental Program

9

Continue Personl & Professionl Honors

**1983-1987**
Board of Directors, Texas Commerce Bank-Gulfway

**1986**
Chairman, Audit Committee, Board of Directors Texas Commerce Bank - Gulfway

## TEXAS DENTAL ASSOCIATION

**1984- 1986**
Member of Executive Committee, Nueces Valley Dental Society

**1984-1986**
Delegate from 15B District

**1993-1996**
Member, Legislative Action Committee, Greater Houston District Dental Society

**1994-1996**
Member, Judicial Committee, Greater Houston District Dental Society

**1996-1997**
Chairman, Judicial Committee, Greater Houston District Dental Society

**1996**
Alternate Delegate, District 8

**1997-1999**
Delegate, District 8

**1997-2000**
Member, Board of Directors, Greater Houston District Dental Society

**1999-2003**
Member, Council on Legislative and Regulatory Affairs

**May 2002**
Received "President's Award"

**June 2002**
TDA Spokesperson before Sunset Commission on SBDE

**2003-Present**
Chairman, Council on Legislative and Regulatory Affairs

10

## TEXAS STATE BOARD OF DENTAL EXAMINERS

1984-1987
Member, Anesthesia Advisory Committee

1987-1993
Appointed by Governor Bill Clements

1988-1989
2nd Vice President

1989-1991
Chairman, Enforcement Committee

1989-1990
Vice President

1989
Authored SBDE Rule 109.173 on "Minimum Standard of Care"

1989
Authored SBDE Rule 109.171-177 on "Office Sedation and Anesthesia"

1990-1991
President Elect

1990
Authored SBDE Rule 109.1752B on "Monitoring of Inhalation Conscious Sedation by Auxiliary"

1990
Author of SBDE certifying test on Monitoring of Inhalation Conscious Sedation by Auxiliary

1991
Author of SBDE Rule 119 providing for Dental Specialty Definitions

1991-1992
President

1991-1992
Chairman, Specialty Licensure Examinations

1993, 1994
Examiner, Specialty Licensing Examination in OMS

2001-2002
Member representing TDA on Advisory Committee on Alternative Training of Dental Hygienists

2002
SBDE selected to serve on Special Task Force on Enforcement

11

# AMERICAN ASSOCIATION OF ORAL AND MAXILLOFACIAL SURGEONS

1996-1999
Member, State and Intergovernmental Affairs Committee

1999-2003
Member, Governmental Affairs Committee

2003
Chairman, Governmental Affairs Committee

2000 – Present
Alternate Delegate from Texas

# AMERICAN BOARD OF ORAL AND MAXILLOFACIAL SURGERY

1994-2000
Examiner for Oral Certifying Examination

1994-1999
Member, Written Examination Committee

1998-1999
Co-Chairman, Section IV of Oral Certifying Examination

1999-2000
Chairman, Section IV of Oral Certifying Examination

# AMERICAN DENTAL ASSOCIATION

2001- Present
Site Surveyor, Council on Dental Accreditation of OMS Training Programs

# SOUTHWEST SOCIETY OF ORAL AND MAXILLOFACIAL SURGEONS

2001-2002
Secretary-Treasurer

2002-2003
Vice-President

2003-2004
President Elect

2004-2005
President

2001-2006
Board of Directors

12

# TEXAS SOCIETY OF ORAL AND MAXILLOFACIAL SURGEONS

1994
Chairman, Health Care Reform Committee

1995-1996
Secretary-Treasurer

1996-1997
Vice President

1997-1998
President Elect

1998-1999
President

1995-2000
Board of Directors

2000 – Present
Alternate Delegate to AAOMS

## MISCELLANEOUS

1989
Preventive Medicine Award
Texas Tech University School of Medicine, Lubbock, Texas

1990- Present
Elected to Fellowship
International College of Dentists

1992- Present
Elected to Fellowship
American College of Dentists

1993-1997
Member, Underwriting Committee
AAOMS National Insurance Company, Chicago, Illinois

1996-1998
Associate Dental Director
Blue Cross-Blue Shield of Texas, Dallas, Texas

1999-2000
National Chairman
Oral and Maxillofacial Surgeons Supporting George W. Bush For President

13