Ashraf **FARISHTA, Individually and as Next Friend for Inaya Farishta, Appellant,**

v.

**TENET HEALTHSYSTEM HOSPITALS DALLAS, INC. d/b/a Trinity Medical Center, Appellee.**

No. 2–06–188–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 25, 2007.

Rehearing Overruled April 26, 2007.

Thorne, Skinner & Thorne, and Michael L. Skinner, Grand Prairie, for Appellant.

Strasburger & Price, LLP, Brian G. Hamilton, Joe Coniglio, and Christine D. Roseveare, Dallas, for Appellee.

Panel B: LIVINGSTON, GARDNER, and McCOY, JJ.

### OPINION

BOB McCOY, Justice.

### I. Introduction

In one issue, Appellant Ashraf Farishta ("Ashraf"), Individually and as Next Friend for Inaya Farishta ("Inaya"), asserts that the trial court abused its discretion, "by looking beyond the four corners of the expert reports, in [an] effort to strike [P]laintiff's expert reports under § 74.351." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2006). While we are not completely certain of the meaning of this issue in the context of the briefing, we agree that the trial court must look only to the four corners of the expert report to determine its adequacy. *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). We will construe the issue within the context of the briefing to mean the trial court abused its discretion in striking the Plaintiff's expert reports for not meeting the statutory requirements. *See* TEX.R.APP. P. 38.9. We reverse and remand to the trial court.

### II. Factual Background

This is the GBS case. Ashraf gave birth to Inaya on August 4, 2003 at Trinity Medical Center ("Trinity"). Inaya developed early onset Group B Streptococcus infection ("GBS") at birth. As a result of Inaya's GBS infection, she developed multiple complications including respiratory distress, cyanosis, and pneumonia requiring intubation and prolonged hospitalization.

In August of 2002, one year prior to Inaya's birth, the United States Government's Centers for Disease Control ("CDC") had published Clinical Practice Guidelines and Recommendations entitled "Prevention of Perinatal Group B Streptococcal Disease." The CDC recommendations were based upon critical appraisal of multi-state population-based observational data and several studies from individual institutions. The CDC Guidelines indicated the following:

Obstetric care [providers], in conjunction with supporting laboratories and labor and delivery facilities, should adopt the following strategy for the prevention of perinatal GBS disease based on prenatal screening for GBS colonization. The risk-based approach is no longer an

acceptable alternative except for circumstances in which screening results are not available before delivery. *All pregnant women should be screened at 35–37 weeks' gestation for vaginal and rectal GBS colonization. At the time of labor or the rupture of membranes, intrapartum chemoprophylaxis should be given to all pregnant women identified as GBS carriers.* [Emphasis supplied.]

The American College of Obstetricians and Gynecologists ("ACOG") adopted the CDC Recommendations and Guidelines, issuing the following statement:

The [ACOG] has issued new recommendations calling for universal screening of pregnant women for [GBS], a leading cause of illness and death among newborns in the United States. Previously, ACOG and other experts had recommended two options for identifying women with GBS: either a culture screening at 35–37 weeks of pregnancy or assessment of clinical risk factors at the time of labor.... The change in clinical practice follows new data and recommendations from the federal Centers for Disease Control and Prevention (CDC) that show routine prenatal screening is significantly more effective than the risk-based approach, resulting in far fewer cases of early-onset GBS disease in newborns (occurring during the first week of life). In light of the new data, the risk-based strategy, except in certain circumstances, is no longer an acceptable alternative.... *The committee opinion supports the CDC's newly revised guidelines that create a screening-based approach for the prevention of early onset GBS disease in the newborn be adopted.* [Emphasis supplied.]

The American Academy of Pediatrics ("AAP") also adopted the CDC guidelines and issued a physician statement endorsement: "The [AAP] endorses and accepts as its policy the sections of this Statement as it relates to infants and children." The report was published in August 2002.

Despite the foregoing, Ashraf asserted that neither Dr. Ahmad, her obstetrician, nor Trinity performed the prenatal GBS testing and screening on her. As a result, the GBS colonization of Ashraf's birth canal was not identified, prophylactic antibiotic therapy was not administered during labor, and Inaya contracted a GBS infection at birth suffering a multitude of complications.

Ashraf sued Trinity, alleging that Trinity's failure to adopt, implement, and enforce the universal GBS culture-based screening protocol, as recommended by the CDC, ACOG, and AAP, was a breach of the standard of care and that she and Inaya were damaged as a result.

In support of these allegations, Ashraf filed three expert reports—an original by Dr. Hunter Hammill, an addendum to the Hammill report, and a report by hospital consultant Arthur S. Shorr. Regarding causation, the original Hammill report said in part:

[T]he injuries to [Inaya] were directly related to [Dr. Ahmad's] failure to follow the standard of care in place in August 2003. In reasonable medical probability, [Ashraf's] GBS colonization would likely have been identified had Dr. Ahmad ordered the requisite GBS culture screen, and thereafter, prophylactic antibiotic therapy during labor would have prevented [Ashraf's] GBS infection. *Dr. Ahmad's failure to follow the standard of care caused [Inaya's] respiratory distress, cyanosis, pneumonia, and other injuries she sustained at birth due to early onset GBS.* [Emphasis supplied.]

Dr. Hammill's addendum to his original report said in part:

In reasonable medical probability, [Ashraf's] GBS colonization would likely have been identified had [Trinity] adopted, implemented, and enforced the requisite GBS culture screen at the 35–37 weeks; and thereafter, *prophylactic antibiotic therapy* during labor would have been initiated in response to the positive culture, and *would have prevented [Inaya's] GBS infection.* [Trinity's] negligence in failing to require its obstetricians practicing within its facility to follow a universal GBS culture-based screening protocol and further failure to require the administration of prophylactic antibiotics (Penicillin) therapy during labor, in the absence of GBS culture status results, was negligent and *such negligence was a proximate cause of [Inaya's] respiratory distress, cyanosis, pneumonia, and other injuries sustained at birth due to early onset GBS.* [Emphasis supplied.]

Trinity asserts that the Hammill addendum did little to elaborate on the subject of causation because it merely stated that the hospital's failure to require Dr. Ahmad to employ universal screening and administer prophylactic antibiotics was negligent and that "such negligence was a proximate cause of [Inaya's] respiratory distress, cyanosis, pneumonia, and other injuries she sustained at birth due to early onset GBS," and that this was insufficient.

Ashraf's hospital administration expert, Shorr, indicated in his report that Trinity had the authority to require that obstetricians on its medical staff provide evidence of negative GBS screening results for all patients admitted to the hospital for labor and delivery, and if such evidence was not provided by the time of admission, to require that such patients be treated with appropriate antibiotics upon admission. Trinity asserts that the Shorr report was similarly conclusory with respect to causation, stating merely that "[b]aby [Inaya] was exposed to GBS, and suffered significant injuries as a result of GBS exposure during delivery." Moreover, Trinity points out that unlike Dr. Hammill, Shorr is not a physician, but instead, a healthcare administration consultant. Dr. Hammill's report also stated that the hospital had the authority and its own independent obligation to require the practitioners using its labor and delivery facilities, including Dr. Ahmad, to meet this minimum level of care.

The trial court sustained Trinity's objections to Ashraf's expert reports and granted its motion to dismiss pursuant to section 74.351 of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351. Subsequently, the trial court granted Trinity's motion to sever. This appeal followed.

## III. Dismissal

In her single issue, we construe that Ashraf complains that the trial court erred in finding her expert reports to be statutorily inadequate and dismissing her case for that reason. Trinity responds that Ashraf's expert reports were conclusory as to causation in general and that they established no link between Trinity's alleged conduct and Inaya's future injuries alleged by Ashraf.

### A. Standard of Review

■■■ A trial court's decision on a motion to dismiss a case under section 74.351 of the Texas Civil Practice and Remedies Code is reviewed under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex.2001) (applying former article 4590i). A trial court abuses its discretion only when it acts in an arbitraty or unreasonable manner without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238,

241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Under this standard, the court of appeals will not merely substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

### B. The Reports

Plaintiff's second amended petition, with respect to causation, alleges the negligence in question was "a proximate cause of Inaya['s] GBS infection, related injuries, illness, developmental impairment, and damages," which damages are then enumerated. Trinity's objections to Dr. Hammill's report and its motion to dismiss complain that the report "only addresses causation on the part of the hospital in a single sentence at the end of the addendum to his report. Further, the one sentence regarding causation is merely conclusory and simply does not satisfy the statutory requirements."

 "Expert report" is defined in section 74.351 as

> a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

Tex. Civ. Prac. & Rem.Code § 74.351(r)(6). Hence, the report has a two-fold purpose: (1) to inform the defendant of the specific conduct that the plaintiff has called into question, and (2) to provide a basis for the trial court to conclude that the plaintiff's claims have merit. *Bowie Mem'l Hosp.,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). Further, "while the expert report does not need to marshal all the evidence necessary to establish causation at trial, it must contain sufficiently specific information to demonstrate causation beyond mere conjecture." *Id.*

 Likewise, the purpose of requiring such a report is clearly to eliminate frivolous claims, akin to meritless claims being eliminated by summary judgment motions. *See Palacios,* 46 S.W.3d at 878. Moreover, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Id.* at 879. The report can be informal in that the information in the report does not have to meet the same requirement as the evidence offered in a summary judgment proceeding or at trial. *Windsor v. Maxwell,* 121 S.W.3d 42, 54 (Tex.App.-Fort Worth 2003, pet. denied).

 A report may be held inadequate as to causation only if it does not constitute a good faith effort to provide a fair summary of the expert's causation opinions. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *Windsor,* 121 S.W.3d at 54. "[I]t is not enough that the expert report 'provided insight' about the plaintiff's claims. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios's* two-part test." *Bowie Mem'l Hosp.,* 79 S.W.3d at 52 (citation omitted); *see supra* p. 453. And, a trial court is obligated to grant a challenge to the sufficiency of an expert only if the report "does not represent an objective good faith effort to comply" with the requisites of the statute. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l*); *N.E. Med. Ctr. v. Crooks,* No. 06–05–149–CV, 2006 WL 1358361, at *5 (Tex.App.-Texarkana May 19, 2006, no pet.) (mem.op.). However, the expert "must explain the bases of the statements [made regarding causation] and link his or her conclusions to the facts." *Longino v. Crosswhite,* 183 S.W.3d 913, 917–18 (Tex.

App.-Texarkana 2006, no pet.) (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 52).

## C. Analysis–Causation in General

With regard to the adequacy of Dr. Hammill's report, Trinity's specific position, as stated by it, is as follows:

> It was not incumbent upon the district court to assume that Inaya's GBS caused respiratory distress, cyanosis, pneumonia and other injuries sustained at birth. To the contrary, it was incumbent upon [Ashraf] to provide an expert report which explained the basis of the expert's statements to link his conclusion (that [Trinity's] negligence caused GBS) to the facts (that Inaya experienced respiratory distress, cyanosis, pneumonia and "other injuries sustained at birth.").

Ashraf responds that she "would show that Dr. Hammill's report clearly and explicitly links [Trinity's] negligence to Inaya[']s] respiratory distress, cyanosis, pneumonia, and other injuries she sustained at birth due to her early onset GBS. This, alone, plainly satisfies the causation requirement set forth under the statute." We agree with Ashraf.

In *Bowie Memorial Hospital v. Wright,* the expert's report on causation stated that "if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome." 79 S.W.3d at 52–53. After examining the expert's report, the court went on to observe the following:

> After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's failure to meet the applicable standards of care and Barbara's injury. That is because the report simply opines that Barbara might have had

"the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara.... Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test.

*Id.* at 53 (citations omitted).

Likewise, in *Barko v. Genzel,* the expert report on the issue of causation consisted of one sentence, stating that "[t]hese violations of the standards of emergency medical practice were a proximate cause in this patient's injury." 123 S.W.3d 457, 460 (Tex.App.-Eastland 2003, no pet.). The court went on to observe that "[s]tanding alone, the final sentence of Dr. Smedley's reports is insufficient to satisfy the expert report requirements outlines in *Wright* and *Palacios* because it merely stated the expert's conclusions about causation.... Dr. Smedley's reports do not link the miscarriage to Dr. Genzel's care." *Id.* We find that these cases cited by Trinity are distinguishable. They are the equivalent of Dr. Hammill having opined that the failure to test for GBS caused respiratory distress and the other injuries. His report goes further. In sum, Dr. Hammill's report indicates that the standard of care was to perform certain tests on Ashraf, that the tests were not performed nor were they required by Trinity, that the failure to perform or require these tests allowed a GBS infection to be present in Inaya, that this infection caused respiratory distress, cyanosis, pneumonia, and other injuries, and that the initiation of appropriate antibiotic therapy would have prevented the infection.

We hold that this report constituted a good faith effort to summarize the causal relationship between the failure to test for GBS and the alleged enumerated injuries suffered by Inaya, that the trial court could not have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship, and that the trial court therefore abused its discretion in striking Dr. Hammill's affidavit for failure to meet the *Palacios* tests.

### D. Analysis–Causation as to Enumerated Injuries Not Addressed by Dr. Hammill

■ Again, Ashraf's second amended petition, with respect to causation, alleges the negligence in question was "a proximate cause of Inaya Farishta's GBS infection, related injuries, illness, developmental impairment, and damages." Dr. Hammill's report states that the breach of the standard of care caused "respiratory distress, cyanosis, pneumonia, and other injuries she sustained at birth," and that "prophylactic antibiotic therapy during labor would have been initiated in response to the positive culture, and would have prevented Inaya's GBS infection." Comparing his reports to the alleged and pled results of the breach of the standard of care, it is seen that the report fails to address "illness," other than the specifically enumerated illnesses, and fails to address "developmental impairment." Hence, these alleged results of the breach of standard of care as pled have not been properly addressed through an expert report and should be dismissed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l*).

A similar result was reached in *Northeast Medical Center v. Crooks*. Mr. Crooks fell out of his bed on more than one occasion, was injured, and eventually died. The expert's report provided in the case stated that a breach of the standard of care "proximately caused the left hip fracture that started the slow deterioration of this 78 year old patient with multiple medical problems, who could not survive the challenges of a hip fracture, surgery, and significant recovery period." *Crooks*, 2006 WL 1358361, at *5. The court found that the death was not properly causally linked by the expert report to the breach of the standard of care, but that the adequacy of the expert report as to causation in the survival cause of action based on Mr. Crooks's injuries from falling out of the bed had not even been challenged. *Id.* Hence, the court sustained the dismissal of the wrongful death cause of action but remanded the case to the trial court on the survival action. *Id.*

Accordingly, we sustain the dismissal of Ashraf's case with regard to injuries other than those enumerated in the Dr. Hammill's report, as previously set forth herein.

■ With regard to the Shorr report, it is axiomatic that a nonphysician may not opine on medical causation matters, and to the extent a portion of his report attempted to do so, the objection to that portion was properly sustained. TEX. CIV. PRAC. & REM.CODE ANN. § 74.403(a) (Vernon 2005).

We sustain Ashraf's sole issue as to causation of Inaya's respiratory distress, cyanosis, pneumonia, and other injuries sustained at birth, but we overrule it as to the other injuries alleged in her second amended petition.

### IV. Conclusion

Having sustained Ashraf's sole issue in part, and overruled it in part, this cause is reversed and remanded to the trial court for further proceedings consistent with this opinion.