COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-09-216-CV

 

 

DANIEL L. FOSTER, D.O.                                                      APPELLANT

 

                                                   V.

 

MARY RICHARDSON                                                              APPELLEE

 

                                              ------------

 

            FROM
THE 17TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

In this interlocutory appeal
concerning the adequacy of an expert report filed in a health care liability
claim under chapter 74 of the civil practice and remedies code (chapter 74),[1]
appellant Daniel L. Foster, D.O. contends in one issue that the trial court
erred by denying his motion to dismiss. 
We affirm in part and reverse and remand in part.

 








Background Facts 

Facts alleged in Richardson=s petition

Appellee Mary Richardson
injured her left leg while working for an airline in December 2006.  Hospital personnel immobilized her knee,
initially told her that she had sustained a knee sprain, and instructed her to
see her primary physician for treatment. 
Richardson=s primary
physician referred her to Dr. Angelo Otero for an orthopedic consultation.[2]  On January 22, 2007, Dr. Otero diagnosed
Richardson with tears of her anterior cruciate ligament (ACL) and lateral
meniscus in her left knee.  On February
15, Dr. Otero surgically reconstructed that knee; he then released her for
light duty at work on February 26 and for full duty on May 14.








On June 21, because she was still experiencing pain in her leg,
Richardson saw Dr. Foster,[3]
who diagnosed her as having complex regional pain syndrome in her left leg and
recommended that she participate in physical therapy.  However, on July 27, Richardson saw an
orthopedic surgeon whose diagnostic tests revealed that Richardson had a
partially-healed ankle fracture. To treat the fracture, the surgeon had to
rebreak Richardson=s
ankle and insert metal hardware into it. 
Richardson asserts that her leg is disfigured and that her ankle will
never function normally because of Dr. Otero=s and Dr. Foster=s
failures to timely diagnose and treat the fracture.

 

Procedural
history

 

Dr. Foster and Dr. Otero[4]
answered Richardson=s
allegations, and then Richardson served both defendants with the expert report
and curriculum vitae of Bryan S. Drazner, M.D. concerning their alleged
deficiencies in providing Richardson=s care, as required by section 74.351 of the civil practice and
remedies code.  See Tex. Civ.
Prac. & Rem. Code Ann. ' 74.351.  Dr. Foster filed a
motion to dismiss under chapter 74, claiming that Dr. Drazner=s report is deficient.  After
the trial court heard arguments from the parties, it denied Dr. Foster=s motion.  Dr. Foster filed his
notice of this interlocutory appeal.  See
id. ' 51.014(a)(9)
(Vernon 2008); Lewis v. Funderburk, 253 S.W.3d 204, 207B08 (Tex. 2008).








The Adequacy of Dr. Drazner=s Expert Report

In one issue, Dr. Foster
asserts that the trial court erred by denying his motion to dismiss and
concluding that Dr. Drazner=s expert report complies with chapter 74. 

Standard of review 

We review a trial court=s denial of a motion to dismiss under section 74.351 for an abuse of
discretion.  See Am. Transitional Care
Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001); Collini
v. Pustejovsky, 280 S.W.3d 456, 461 (Tex. App.CFort Worth 2009, no pet.) (op. on remand); Moore v. Gatica, 269
S.W.3d 134, 139 (Tex. App.CFort Worth 2008, pet. denied) (op. on remand).  We also review a trial court=s decision on whether a physician is qualified to offer an expert opinion
in a health care liability claim under an abuse of discretion standard.  Collini, 280 S.W.3d at 461; Moore,
269 S.W.3d at 139. 








        To determine whether a trial court abused
its discretion, we must decide whether the trial court acted without reference
to any guiding rules or principles; in other words, we must decide whether the
act was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241B 42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986); see
Collini, 280 S.W.3d at 461. 
Merely because a trial court may decide a matter within its discretion
in a different manner than an appellate court would in a similar circumstance
does not demonstrate that an abuse of discretion has occurred.  Downer, 701 S.W.2d at 242; Collini,
280 S.W.3d at 461.  A trial court does
not abuse its discretion if it commits a Amere error in judgement.@  See E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995); Collini, 280
S.W.3d at 461. 

The statutory requirements of expert
reports

A plaintiff must serve an
expert report that addresses liability and causation on each defendant no later
than the 120th day after the plaintiff files a health care liability
claim.  Tex. Civ. Prac. & Rem. Code Ann.
' 74.351(a), (j). If an expert report has not been served on a
defendant within the 120‑day period, then on the motion of the affected
defendant, the trial court must dismiss the claim with prejudice and award the
defendant reasonable attorney=s fees and costs.  Id. ' 74.351(b).  A report Ahas not been served@ under the statute when it has physically been served but a court
finds it deficient.  See id. ' 74.351(c); Leland v. Brandal, 257 S.W.3d 204, 207 (Tex.
2008); Lewis, 253 S.W.3d at 207B08.  








A report is deficient
(therefore subjecting a claim to dismissal) when it Adoes not represent an objective good faith effort to comply with the
[statute=s] definition of an expert report.@  Tex. Civ. Prac. & Rem.
Code Ann. ' 74.351(l);  Collini, 280 S.W.3d at 461B62.  While the expert report Aneed not marshal all the plaintiff=s proof,@ it must
provide a fair summary of the expert=s opinions as to the applicable standards of care, the manner in which
the care rendered by the physician failed to meet the standards, and the causal
relationship between that failure and the injury, harm, or damages
claimed.  Tex. Civ. Prac. & Rem. Code
Ann. ' 74.351(r)(6); Palacios, 46 S.W.3d at 878; Collini, 280
S.W.3d at 462.

To qualify as a good faith
effort, the report must Adiscuss the
standard of care, breach, and causation with sufficient specificity to inform
the defendant of the conduct the plaintiff has called into question and to
provide a basis for the trial court to conclude that the claims have merit.@  Palacios, 46 S.W.3d at
875; Benish v. Grottie, 281 S.W.3d 184, 194 (Tex. App.CFort Worth 2009, pet. denied). 
A report does not fulfill this requirement if it merely states the
expert=s conclusions or if it omits any of the statutory requirements. Palacios,
46 S.W.3d at 879; Benish, 281 S.W.3d at 194. 








The information in the report
Adoes not have to meet the same requirements as the evidence offered in
a summary‑judgment proceeding or at trial.@  Palacios, 46 S.W.3d at
879.  The expert report must Acontain sufficiently specific information to demonstrate causation
beyond mere conjecture.@  Farishta v. Tenet Healthsystem Hosps.
Dallas, Inc., 224 S.W.3d 448, 453 (Tex. App.CFort Worth 2007, no pet.).

The facts alleged in Dr. Drazner=s report

According to his report, Dr.
Drazner physically evaluated Richardson on July 26, 2007, and he became
concerned about aspects of her prior care at that time.  During his examination of Richardson, he
noticed a Aprofound
range of motion deficit of the left ankle, left ankle edema, and left calf pain
prior to the receipt of diagnostic testing.@  He also reviewed Dr. Foster=s and Dr. Otero=s records of
Richardson=s treatment.








Dr. Drazner=s report recites that after Richardson=s initial injury in December 2006, hospital personnel examined her
left foot, ankle, and knee, and they Ainexplicably opined@ that she had a knee sprain or strain, without Aany positive findings about the knee objectively.@  Dr. Otero examined Richardson
about a month later by taking x-rays that, although resulting negative, led Dr.
Otero to conclude that there was an Aacute tear of the [ACL].@ Dr. Otero ordered an MRI scan, but the scan did not reveal signs of
an ACL tear, and it only showed minor abnormalities about the knee=s meniscus that existed because of knee surgery that Richardson had
previously received.  Thus, the report
alleges that Dr. Otero operated on Richardson=s knee without an adequate medical basis and despite Richardson=s complaints to him about pain in her ankle.

The report continues by
describing Richardson=s attempt to
get a second opinion about her pain from Dr. Foster after Dr. Otero=s surgery.  It states in
relevant part,

Although Dr. Foster noted
that Ms. Richardson=s left calf
was smaller than her right calf, and superficial tenderness to palpation, Dr.
Foster did not perform a range of motion on Ms. Richardson=s left ankle or identify the ligaments that he examined.  Dr. Foster diagnosed Ms. Richardson=s problem as Acomplex
regional pain syndrome of the left lower extremity.@  Dr. Foster arrived at his
opined diagnosis, failing to document the hallmarks of the condition, well
delineated in the [American Medical Association] Guide, Fifth Edition, to
include hypersensitivity to light touch, withdrawal behavior, hyperhidrosis,
hyperfusion, mottling and hair and nail bed changes. 

The Standard of Care
Applicable to both Dr. Otero and Dr. Foster:

It is the standard of care for a physician who is
examining a patient=s leg
injury to perform a thorough [orthopedic] examination in order to determine the
nature and extent of the injury.  It is
also the standard of care when examining a leg injury, to perform full range of
motion testing regarding the injured leg, including the knee, the ankle, and
the foot, and to detail the findings of the examination. . . .  

 

Breach
of Standard of Care:

 








From their records, neither Dr. Otero nor Dr.
Foster performed a thorough examination of Ms. Richardson=s
left leg, including her ankle and foot. . . . 
Without a complete [orthopedic] examination, including full range of
motion testing, and the obtainment of appropriate objective diagnostic tests on
Ms. Richardson=s
ankle and foot, an accurate diagnosis was not possible. . . .  Although Ms. Richardson may have sprained her
knee, it was later discovered (not by Dr. Otero or Dr. Foster) that Ms.
Richardson had fractured her left distal fibula.  Nevertheless, . . . Dr. Foster had ignored
the patient=s
complaints of calf pain and tenderness, . . . attributing her complaints as a
complication of the knee surgery performed by Dr. Otero.

 

Results of Defendants= Breach of the Standard of Care:

. . .  If
Dr. Otero and Dr. Foster had performed a complete examination of Ms. Richardson=s
left leg, including her tibula/fibula, ankle and foot, and/or if they had
referred Ms. Richardson for a second opinion, while treating her conservatively
to determine the true nature of her injury, an unnecessary knee surgery would
not have been performed.  Moreover, due
to the physicians=
failure to correctly diagnose Ms. Richardson=s injury, her fracture went
completely undetected for over seven months and the patient was subjected to
. . . a prolonged period of pain and requirement for exhaustive narcotic
enalyens, usage of a bone growth stimulator and another surgery to remove
painful surgical hardware, a prolonged period of disability, and . . . loss of
hind foot motion, . . . as well as moderate chronic pain.  As a result, it is my opinion that Ms.
Richardson will suffer from impairments that could have been prevented had her
injury been properly and timely diagnosed and treated before the fracture had
healed incorrectly failed to heal, moved to non-union, and required further
exhaustive care.[5]








The adequacy of Dr. Drazner=s report as to causation

In the first part of his only
issue, Dr. Foster contends that Dr. Drazner=s report is deficient because Dr. Drazner=s statements related to the cause of Richardson=s injuries are factually unsupported and inadequately explained and
because the report does not differentiate Dr. Foster=s and Dr. Otero=s actions
that allegedly contributed to Richardson=s injuries.[6]

The factual explanation of
causation        

Dr. Foster asserts that
Richardson=s allegedly
unnecessary knee surgery cannot have any causal link to Dr. Foster=s diagnosis because Richardson=s petition and Dr. Drazner=s report establish that Dr. Foster first saw Richardson about four
months after the surgery.  Dr.
Foster also argues that Dr. Drazner=s report Amakes no
attempt to explain how Dr. Foster=s alleged breachCthe one
month delay in diagnosis that occurred six months after the injuryChad any causal relationship with the corrective [ankle] surger[ies]
performed a little over one month later.@








Richardson says that these
arguments misunderstand Athe nature
of the claims brought against Foster@ and represents in her brief that her claims against Dr. Foster are
based on Aother
injuries caused by his negligence,@ specifically referring to her pain caused by Dr. Foster=s failure to properly diagnose and treat the ankle injury.  Undoubtedly, Dr. Foster is correct that he
could not have caused Richardson=s knee surgery, and Richardson has acknowledged this fact.  However, while Richardson=s petition alleges that both doctors= acts, Asingularly
or in combination, were a proximate cause@ of her damages that include expenses for medical care that could
relate to the knee surgery or the ankle surgeries (to initially treat the ankle
fracture and to remove the surgical hardware), the petition also asks for
damages related to physical pain and mental anguish suffered in the past and to
be suffered in the future and physical disability and disfigurement suffered in
the past and to be suffered in the future.








Dr. Drazner=s report explains that Dr. Foster=s alleged misdiagnosis caused Richardson to suffer Aa prolonged period of pain@ and Aa prolonged
period of disability.@  Thus, assuming that Dr. Drazner correctly
concluded that Dr. Foster=s diagnosis
of complex regional pain syndrome was erroneous and that he should have
diagnosed her with an ankle fracture, Dr. Drazner=s report links Richardson=s continued pain and disability related to the fracture[7]
to Dr. Foster=s erroneous
diagnosis for as long a periodChere, more than a monthCuntil her condition was correctly diagnosed and treated.








Nonetheless, Dr. Foster
relies on a recent San Antonio Court of Appeals opinion to argue that Dr.
Drazner=s report is still insufficient in explaining causation even if it
shows that Dr. Foster=s
misdiagnosis induced Richardson=s continued pain and disability. 
See Jones v. King, 255 S.W.3d 156 (Tex. App.CSan Antonio 2008, pet. denied) (mem. op.).  In Jones, King, who suffered from
chronic pain, alleged that Dr. Jones=s allegedly improper treatmentCthe placement of a morphine pumpCcaused her to develop several health problems, including meningitis.  Id. at 158.  Dr. Jones, an anesthesiologist, alleged that
the expert report written by Dr. Gregory Powell did not adequately address the
causal connection between breaches of standards of care and King=s injuries.  Id.  The San Antonio court explained that the
report contained Alittle more
than a series of repetitious conclusory statements@ such as, Athe failure
to timely detect the meningitis and treat it for more than forty-eight hours
caused it to become worse and resulted in numerous additional complications and
injuries including decreased vision, diabetes insipidus, and pain.@  Id.  at 159. 
The majority opinion said,

[A]
close reading of the relevant portions of the report confirms Powell=s
failure to link any delay in diagnosis to any additional pain and suffering or
exacerbation of the meningitis than what would have occurred in the face of an
earlier diagnosis.

 

Stated another way, while it may be facially
appealing to infer additional pain and suffering resulted from the alleged
delay in diagnosis, the trial court is not permitted to rely on such
speculation in determining the adequacy of the report.  While Powell clearly states King suffered Aextra@ or Aadditional@ pain
and suffering due to the 48‑hour delay in diagnosis, he fails to provide
any baseline from which the trial court could conclude the delay caused
the results.  Powell
does not explain what facts led him to his conclusions.  His report does not indicate the normal or
expected course of meningitis once treatment has begun. Does meningitis
become more difficult to treat or take longer to resolve if treatment is
delayed?  Does the disease become
more virulent due to lack of treatment? 
While Powell also states King was Ahospitalized twice,@ Alost
over thirty days at work,@ and Aincurred
a substantial amount of medical bills during the hospitalizations,@ he
does not attempt to explain how these results would not have occurred if the
diagnosis of meningitis had occurred 48 hours earlier. . . .

 

. . . 
Here, Powell offered no medical explanation about whether earlier
treatment would have been effective in shortening the duration of the
meningitis, precluding additional pain and suffering, or preventing other
alleged injuries and damages.

 

Id. at
159B60
(citations omitted and italic emphasis added).

 








However, unlike the expert
report at issue in Jones, which, according to the majority opinion, did
not explain how a delay in diagnosis lengthened King=s pain by delaying the resolution of her meningitis, Dr. Drazner=s report does explain how Dr. Foster=s alleged failure to Adetermine the true nature of [Richardson=s] injury@ left her
ankle fracture untreated and subjected Richardson to prolonged pain.  Thus, we conclude that the facts in Jones are
distinguishable from those involved here. 









However, even if the Jones
opinion could be read to render a report inadequate on causation when the
report sufficiently links a misdiagnosis to pain that is prolonged until a
correct diagnosis is made and the correct treatment is given, we disagree with
the opinion.  Cf. Moore v. Sutherland,
107 S.W.3d 786, 791 (Tex. App.CTexarkana 2003, pet. denied) (holding that an expert report based on a
doctor=s misdiagnosis is sufficient as to causation when it specifically
states what the defendant Ashould have done and what happened because he failed to do it@); see also Sullivan v. Methodist Hosps. of Dallas, 699
S.W.2d 265, 274B75 (Tex.
App.CCorpus Christi 1985) (holding that the failure to diagnose the
presence of a sponge in an abdomen sufficiently caused the plaintiff=s injury when the plaintiff suffered from Aadditional physical suffering@), writ ref=d n.r.e., 714 S.W.2d 302 (Tex.
1986).  For these reasons, we hold that,
to the extent that Richardson=s claim against Dr. Foster concerns her prolonged pain because of his
alleged misdiagnosis, the trial court did not abuse its discretion by denying
Dr. Foster=s motion to
dismiss based on his allegation that Dr. Drazner=s causation opinion is factually unsupported or inadequately
explained.  See Palacios,
46 S.W.3d at 875.

However, to the extent that
Richardson=s claim
against Dr. Foster asserts that his alleged misdiagnosis caused her to require
ankle surgeries and caused the other alleged harmful conditions related to the
surgeries,[8]
we conclude that Dr. Drazner=s report provides a deficient explanation of causation.  See Farishta, 224 S.W.3d at 453, 455
(indicating that an expert report must provide an adequate explanation of
causation as to each injury claimed by a plaintiff and








affirming the trial court=s dismissal of particular damage theories that the expert report had
not adequately addressed); see also Benson v. Vernon, No. 10‑08‑00271‑CV,
2009 WL 2462657, at *3 (Tex. App.CWaco Aug. 12, 2009, no pet.) (citing Farishta and holding
similarly).  Dr. Drazner=s report says that Richardson required Anarcotic enalyens@ and Ausage of a
bone growth stimulator and another surgery to remove painful surgical hardware@ and suffered Aloss of hind
foot motion and injury to the superficial peroneal nerve, as well as moderate
chronic pain@ because her
ankle had Afailed to
heal, moved to non-union, and required further exhaustive care.@  But Dr. Drazner=s report does not identify how Dr. Foster=s alleged misdiagnosis in June 2007, which caused about one month=s delay in correctly diagnosing the ankle injury after the correct
diagnosis had already been delayed for about six months since the initial
injury in December 2006, contributed to the requirement of such exhaustive
care.  In other words, the report does
not explain beyond mere conjecture how the condition of Richardson=s ankle worsened from June 2007 to July so that Dr. Foster=s failure to give a correct diagnosis in June caused the requirement
of further treatment in July that would not have otherwise been required if Dr.
Foster had correctly diagnosed the injury. 
See Farishta, 224 S.W.3d at 453, 455.  Thus, we hold that the trial court abused its
discretion to the extent that it found that Dr. Drazner=s report provided a sufficient explanation about Dr. Foster=s actions causing Richardson=s ankle treatment. See Palacios, 46 S.W.3d at
875.  We sustain Dr. Foster=s sole issue as to that limited basis.

The report=s collective referrals to Dr. Foster and Dr. Otero   








Next, Dr. Foster argues that
Dr. Drazner Afailed to
explain how each defendant specifically and individually caused or contributed
to Richardson=s injury@ and that the report=s alleged Acollective
assertions of negligence@ are
inadequate because Dr. Drazner Amerely prefaces every sentence regarding causation with both doctors[>] names.@  He cites several cases to propose that expert
reports must differentiate the conduct of multiple defendants.  See, e.g., Longino v. Crosswhite ex rel.
Crosswhite, 183 S.W.3d 913, 917 (Tex. App.CTexarkana 2006, no pet.) (holding that a report was deficient because
it did not contain Aspecific
information concerning how [one doctor] breached the standard of care apart
from [another doctor=s] conduct@ when the plaintiff=s complaint concerned the doctors= joint treatment decision while the patient suffered from bacterial
meningitis); Taylor v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241,
244B46 (Tex. App.CCorpus Christi
2004, no pet.) (holding that a report was deficient because it did not Apresent the standards of care relevant@ to each defendant or distinguish among several defendants concerning
how breaches of their standards of care contributed to an alleged failure to
diagnose and treat a heart condition).[9]








Here, unlike in Longino
and Taylor, the report explained that Dr. Otero=s treatment of Richardson was independent of and attenuated in time
from Dr. Foster=s
diagnosis.  Dr. Drazner=s report connects Dr. Foster=s actions to Richardson=s delay in receiving proper treatment for her ankle fracture by
stating (in a paragraph that is independent from any discussion of Dr. Otero),

Although
Dr. Foster noted that Ms. Richardson=s left calf was smaller than
her right calf, and superficial tenderness to palpation, Dr. Foster did not
perform a range of motion [test] on Ms. Richardson=s
left ankle or identify the ligaments he examined. . . .  Dr. Foster arrived at his opined diagnosis,
failing to document the hallmarks of the [complex regional pain syndrome]
condition. 

 

The report further states in its standard of care
section of Aboth Dr.
Otero and Dr. Foster@ that (1)
orthopedic examinations should include a full range of motion test regarding
the knee, ankle, and foot, and that a doctor should detail the results of the
test, and (2) if a doctor cannot objectively diagnose the source of pain,
the doctor should refer the patient for a second opinion.

The report then alleges that
both doctors breached the standard of care through their separate treatment of
Richardson=s
injury.  The report refers to the doctors
collectively, in part, by stating that Aneither Dr. Otero nor Dr. Foster performed a thorough examination@ because they both did not complete full range of motion testing and
they therefore failed to diagnose the ankle fracture. It also refers to the
doctors collectively by stating as to causation, A[D]ue to the physicians= failure to correctly diagnose Ms. Richardson=s injury, . . . [she] was subjected to . . . a prolonged period of
pain.@













However, we cannot agree with
Dr. Foster=s assertion
that the report was required to say in a separate sentence within its standard
of care section that Dr. Foster needed to and failed to perform the range of
motion test (rather than alleging that same fact within a sentence that also
mentioned Dr. Otero) because the report had previously independently explained
why Dr. Foster should have performed the test. 
We also cannot agree that the report needed to use a separate sentence
to explain how Dr. Foster=s conduct
delayed the correct diagnosis of Richardson=s ankle injury and thus prolonged her pain when that was adequately
indicated by the rest of the report. 
Thus, we conclude that Dr. Drazner=s report is not deficient merely because it contains some collective
statements regarding actions that both doctors should have taken while they
independently cared for Richardson.  See
Barber v. Dean, No. 02‑07‑00353‑CV, 2009 WL 3490952, at
*10 (Tex. App.CFort Worth
Oct. 29, 2009, no pet. h.) (holding that a report is not deficient for grouping
defendants together when it specifically states that they all owed the same
duty of care); Livingston v. Montgomery, 279 S.W.3d 868, 873 (Tex. App.CDallas 2009, no pet.) (explaining that Athe fact that [the report] identifies one standard of care for more
than one defendant does not render [the report] deficient@); Sanjar v. Turner, 252 S.W.3d 460, 466B67 (Tex. App.CHouston
[14th Dist.] 2008, no pet.) (holding the same and noting that nothing Aforbids applying the same standard of care to more than one physician
if . . . they all owed the same duty to the patient@). 

Thus, we hold that the trial
court also did not abuse its discretion by denying Dr. Foster=s motion to dismiss Richardson=s claim on the basis that portions of Dr. Drazner=s report referred to the doctors= conduct collectively. See Palacios, 46 S.W.3d at
875.

Dr. Drazner=s qualifications

In the final part of his sole
issue, Dr. Foster contends that Dr. Drazner is not qualified to submit an
expert report on causation.  An expert
report authored by a person who is not qualified to testify cannot constitute
an adequate report.  Collini, 280
S.W.3d at 462; see Ehrlich v. Miles, 144 S.W.3d 620, 624B26 (Tex. App.CFort Worth
2004, pet. denied). The proper inquiry concerning whether a doctor is
qualified to testify is not his area of practice but his familiarity with the
issues involved in the claim before the court. 
Collini, 280 S.W.3d at 464; see Blan v. Ali, 7 S.W.3d 741,
745 (Tex. App.CHouston
[14th Dist.] 1999, no pet.).








To be qualified to submit a
report on the causal relationship between the breach of a physician=s standard of care and harm, the reporting physician must be Aotherwise qualified to render opinions on such causal relationship
under the Texas Rules of Evidence.@  Tex. Civ. Prac. & Rem.
Code Ann. ' 74.351(r)(5)(C);
see Tex. R. Evid. 702 (explaining that if Aspecialized knowledge will assist the trier of fact to understand the
evidence or to determine a fact in issue, a witness qualified as an expert by
knowledge, skill, experience, training, or education may testify thereto in the
form of an opinion@); Collini,
280 S.W.3d at 465.[10]









To be so qualified under rule
702, an expert must have knowledge, skill, experience, training, or education
regarding the specific issue before the court that would qualify the expert to
give an opinion on that particular subject. See Helena Chem. Co. v.
Wilkins, 47 S.W.3d 486, 499 (Tex. 2001); Thomas v. Alford, 230
S.W.3d 853, 857, 860 (Tex. App.CHouston [14th Dist.] 2007, no pet.) (holding that because the doctor
who submitted an expert report did not demonstrate knowledge of cancer
treatment, he was not qualified to offer an opinion that an earlier diagnosis
could have produced a better outcome for the plaintiff) (citing Broders v.
Heise, 924 S.W.2d 148, 153 (Tex. 1996)); Mem=l Hermann Healthcare Sys. v. Burrell, 230
S.W.3d 755, 762B63 (Tex.
App.CHouston [14th Dist.] 2007, no pet.) (deciding that a doctor was
qualified to opine about causation because his report demonstrated direct
experience with treating decubitus ulcers, which was the condition at
issue).  In other words, 

there
is no validity, if there ever was, to the notion that every licensed medical
doctor should be automatically qualified to testify as an expert on every
medical question. . . .  [T]he proponent
of the testimony has the burden to show that the expert >possesses
special knowledge as to the very matter on which he proposes to give an
opinion.=

 

Ehrlich, 144
S.W.3d at 625 (quoting Broders, 924 S.W.2d at 152B53). AA medical
expert who is not of the same school of medicine, however, is competent to
testify if he has practical knowledge of what is usually and customarily done
by a practitioner under circumstances similar to those confronting the
defendant.@  Id. 









Dr. Foster argues that Dr.
Drazner is not qualified as an expert on causation in this case because
although Dr. Foster is an orthopedic surgeon, Dr. Drazner Ais an internist who specializes in Physical Medicine and
Rehabilitation@ and has not
demonstrated Athat he has
had education or experience in the diagnosis, care, or treatment of an
orthopedic surgery patient.@  Dr. Foster relies on Ehrlich
and Collini.  In Ehrlich,
we held that a neurologist, although skilled in the treatment of issues related
to the nervous system, was not qualified to submit an expert report on the
validity of surgical procedures used during the plaintiff=s face lift and implants.  Id.
at 625B26.  In Collini, we
concluded that  a doctor was not
qualified to submit a report about whether the prolonged prescription of a drug
caused the plaintiff=s condition
because the doctor did not show that he had any knowledge, experience,
education, or training on that causal relationship or about the specific drug
or condition involved in the case.  Collini,
280 S.W.3d at 465B66.

This case is different from Ehrlich
and Collini because Dr. Drazner has shown experience with the exact
issue involved in Richardson=s claim against Dr. Foster.  Dr.
Drazner=s report assigns blame to Dr. Foster for failing to follow orthopedic
diagnostic procedures (such as failing to complete a range of motion test and
failing to document hallmarks of the complex regional pain syndrome) that would
have allowed him to correctly diagnose Richardson=s broken ankle and thus avoid (among other results) the continued pain
associated with an incorrect diagnosis; it does not assess blame on Dr. Foster
for processes involved with an orthopedic surgery.








Rather, our case is more akin
to Barber v. Mercer, where we determined that an anesthesiologist was
qualified to give an expert report on a surgeon during orthopedic surgery
regarding the proper positioning and padding of the patient.  No. 02‑08‑00079‑CV, 2009 WL
3337192, at *8 (Tex. App.CFort Worth
Oct. 15, 2009, no pet.).  Dr. Drazner=s report and curriculum vitae establish his qualifications to submit a
report about orthopedic diagnostic procedures; they show that he obtained his
medical degree in 1986 and that at the time he submitted his report, he had
practiced medicine in Texas for eighteen years with a specialty in physical
medicine and rehabilitation and a secondary specialty in occupational
medicine.  He primarily treats patients
who have suffered orthopedic injuries, and he has Atreated approximately 20,000 patients with [orthopedic] injuries and
performed several hundred thousand [orthopedic] examinations.@  Since 1995, he has practiced
in the area of APhysical
Medicine and Rehabilitation, Pain Management.@

Dr. Drazner has served as a
featured speaker on several topics, including one on AMultidisciplinary Approaches to the Management of Complex Regional
Pain Syndrome,@ which is
the particular condition that Dr. Foster diagnosed Richardson as having.  Dr. Drazner has also lectured on the
management of knee injuries.








Therefore, we hold that the
trial court did not abuse its discretion by denying Dr. Foster=s motion to dismiss on the basis that Dr. Drazner is not qualified to
provide an opinion on the causal relationship between Dr. Foster=s actions and Richardson=s harm.  See Palacios,
46 S.W.3d at 875.[11]








Conclusion

Having overruled the majority
of Dr. Foster=s sole issue
regarding Richardson=s assertion
that his alleged misdiagnosis caused her additional pain, we affirm the trial
court=s order denying his motion to dismiss as to that issue. Having
sustained a portion of Dr. Foster=s sole issue concerning Richardson=s assertion that his alleged misdiagnosis caused her need for ankle
surgeries and having found Dr. Drazner=s report deficient as to that causal relationship, we reverse the
trial court=s decision
regarding the sufficiency of the report in that regard and remand this case to
that court to consider the issue of whether to grant Richardson a thirty‑day
extension to cure that deficiency.  See
Tex. Civ. Prac. & Rem. Code Ann. ' 74.351(c); Leland, 257 S.W.3d at 207; Collini, 280
S.W.3d at 468. 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

 

CAYCE,
C.J. not participating.

 

DELIVERED:  December 31, 2009











[1]See Tex.
Civ. Prac. & Rem. Code Ann. '' 74.001B.507
(Vernon 2005 & Supp. 2009).





[2]AOrthopedics@ (or Aorthopaedics@) is
the Amedical
speciality concerned with the preservation, restoration, and development of
form and function of the musculoskeletal system, extremities, spine, and
associated structures by medical, surgical, and physical methods.@  Stedman=s Medical Dictionary 1383
(28th Ed. 2006).





[3]The
record does not indicate who referred Richardson to Dr. Foster.  





[4]The
claims against Dr. Otero are still pending and are not at issue in this
appeal.  





[5]The
words Afailed
to heal, moved to non-union, and required further exhaustive care@ are
hand written.





[6]Some
of Dr. Foster=s
contentions during oral argument regarded the alleged vagueness of Dr. Drazner=s
statements regarding Dr. Foster=s standards of care.  But Dr. Foster=s
argument in his brief concerns the adequacy of Dr. Dranzer=s
report as to causation, not standards of care, and we will not consider whether
the report was adequate as to standards of care.  See Tex. R. App. P. 39.2 (explaining
that the purpose of oral argument is to clarify the written arguments in
briefs); El Paso Natural Gas Co. v. Strayhorn, 208 S.W.3d 676, 681 (Tex.
App.CTexarkana
2006, no pet.).





[7]Dr.
Drazner=s
report alleges that Richardson complained of pain when she saw Dr. Foster in
June 2007.





[8]Despite
Richardson=s
statement in her brief that Dr. Foster misunderstands the nature of her claims,
Richardson claimed at trial in her response to Dr. Foster=s
dismissal motion and also claimed at oral argument on appeal that the delay
caused by Dr. Foster=s
alleged misdiagnosis contributed to the need for her two ankle surgeries.  Dr. Drazner=s
report also asserts such a conclusion.





[9]Dr.
Foster also relies on the El Paso Court of Appeals opinion in Murphy v.
Mendoza, 234 S.W.3d 23, 29 (Tex. App.CEl Paso 2007, no pet.).  That case is inapposite because the report
did not even identify the defendants by name when referring to their allegedly
incorrect evaluations of a bladder biopsy, so it could not have discussed the
standards of care related to both doctors Aif the roles and
responsibilities differed.@  Id.

 





[10]The
parties discuss sections 74.351(r)(5)(A) and 74.401(a) of the civil practice
and remedies code, which relate to the expert qualifications to submit an
opinion Aregarding
whether a physician departed from accepted standards of medical care.@  See Tex. Civ. Prac. & Rem. Code
Ann. ''
74.351(r)(5)(A), 74.401(a).  However, Dr.
Foster has not directly challenged Dr. Drazner=s
qualifications in that regardCthe heading on his
qualification challenge in his brief is ADrazner is Not Qualified to
Provide Adverse Causation Opinions,@ and the analysis in his
brief also focuses on causation.  Thus,
we will focus on the qualification standards under section 74.351(r)(5)(C),
although we acknowledge that there may be some overlap between those standards
and the standards related to qualifications for duty of care and breach.





[11]Dr.
Foster contends that Dr. Drazner was required to establish that he is qualified
to provide an opinion on the length of time it takes a bone to set so that he
could show that Richardson=s ankle fracture worsened between
Dr. Foster=s
diagnosis and the later diagnosis of Richardson=s
broken ankle. Because we have already sustained Dr. Foster=s
issue about the expert report=s adequacy to establish a
causal relationship between Dr. Foster=s actions and Richardson=s
ankle treatment, we will not address Dr. Drazner=s
qualifications to provide an opinion on that same issue.  See Tex. R. App. P. 47.1.